# 24-418

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

TRADE LINKS, LLC,

*Plaintiff-Appellee,*

—against—

BI-QEM SA DE CV, BI-QEM, INC.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (BRIDGEPORT)

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS

JAMES P. CINQUE
CINQUE & CINQUE, P.C.
355 Lexington Avenue, 8th Floor
New York, New York 10017
(212) 759-5515

*Attorneys for Defendants-Appellants*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant-Defendant Bi-Qem, Inc. submits the following statement:

1. Appellant-Defendant's parent company is Bi-Qem Holding AB, a Swedish entity.

2. No publicly held corporation owns ten (10%) percent or more of Appellant-Defendant's stock.

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES                                              ii

STATEMENT OF THE CASE                                            1

   1.  Nature of the Case                                       1

     (a)  Overview                                          1

     (b)  Relevant Facts                                    3

   2.  Judge Rendering the Decisions                           7

   3.  Disposition Below                                       7

   4.  Citations of Decisions                                  8

POINT I   -    EXPERT TESTIMONY OF MR. MARCUS
                  SHOULD HAVE BEEN STRICKEN                  8

POINT II   -    TRADE LINKS' FAILURE TO PROVIDE
                  A THIRTY (30) DAY NOTICE TO CURE
                  IS FATAL TO ITS CLAIMS                     25

POINT III  -    TRADE LINKS WAS NOT ENTITLED
                  TO ATTORNEYS' FEES UNDER THE
                  INDEMNIFICATION PROVISION
                  OF THE SRA                                 31

CONCLUSION                                                       34

i

# TABLE OF AUTHORITIES

**Case**                                                        **Page**

Amorgianos v. National Railroad Passenger Corp.,
    303 F.3d 256 (2nd Cir. 2002)                          25

Centerplan Construction Co., LLC v. City of
    Hartford, 343 Conn. 368 (2022)                         30

Coppola Construction Co., Inc. v. Hoffman Enterprises
    Limited Partnership, 157 Conn. App. 139, *cert.*
    denied*, 318 Conn. 902 (2015)                         29

Danbury Buildings, Inc. v. Union Carbide Corp.,
    963 F. Supp. 2d 96 (D. Conn. 2013)                     34

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)                                    1, 2, 6, 9, 10,
                                                           14, 16, 21, 24

Design Strategy, Inc. v. Davis, 469 F.3d 284 (2d Cir. 2006)    21

Dugan v. EMS Helicopters, Inc., 915 F.2d 1428
    (10th Cir. 1990)                                       27

Fraser v. Wyeth, Inc., 992 F.Supp.2d 68 (D. Conn. 2014)        17

Hardeman v. Monsanto Co., 997 F.3d 941 (9th Cir. 2021)         22

Hewlett-Packard Co. v. EMC Corp., 330 F.Supp.2d 1087
    (N.D. Cal. 2004)                                       16

In re Onglyza, 95 F.4th 339 (6th Cir. 2024)                    22

Laber v. Long View R.V., Inc., 454 F. Supp.3d 158
    (D. Conn. 2020)                                        17

Nease v. Ford Motor Co., 848 F.3d 219 (4th Cir. 2017) 22

Patterson v. Balsamico, 440 F.3d 104 (2d Cir. 2006) 14, 15

Perkins v. Origin Medsystems, Inc., 299 F. Supp.2d 45
  (D. Conn. 2004) 17

Ramirez v. Health Net of Northeast, Inc., 285 Conn.
  1 (2008) 26

Rand-Whitney Containerboard Ltd. Partnership v.
  Town of Montville,290 Fed.Appx. 430
  (2d Cir. 2008) 32

Sardis v. Overhead Door Corp.,10 F.4th 268
  (4th Cir. 2021) 21

Shah v. Cover-It, Inc., 86 Conn. App. 71 (2004) 31

Shuffle Tech Int'l LLC v. Scientific Games Corp.,
  2018 WL 3104301 (N.D. Ill.) 27

TVT Records v. Island Def Jam Music Group,
  250 F. Supp.2d 341(S.D.N.Y. 2003) 10

U.S. v. Forbes, 2006 WL 2792883 (D. Conn.) 18

U.S. v. McKeon, 738 F.2d 26 (2d Cir. 1984) 28

U.S. v. Valencia-Lopez, 971 F.3d 891 (9th Cir. 2020) 24

Weisgram v. Marley Co., 528 U.S. 440 (2000) 11, 24, 25

Weiss v. Smulders, 313 Conn. 227 (2014) 29

Wells Fargo Bank, N.A. v. Lorson, 341 Conn. 430 (2021) 30

iii

## **Authorities**

American Institute of Certified Public Accountants
Code of Professional Conduct Section 1.295.140.02      13

American Institute of Certified Public Accountants
Code of Professional Conduct Section 1.295.140.04      12

Connecticut Commissions Statute      4, 8

Connecticut Franchise Act      4

Connecticut General Statute §52-568      4

Connecticut Unfair Trade Practices Act      4, 5

Connecticut District Court Local Rule 77(a)(2)      7

Federal Rule of Civil Procedure 37      21

Federal Rule of Civil Procedure 50(b)      20

Federal Rule of Evidence 801(d)(2)      27

Massachusetts Unfair TradePractices Act,
Chapter 93A      4, 5

## STATEMENT OF THE CASE

### 1. Nature of the Case

### (a)    Overview

The Trial Court, declining its gatekeeping responsibilities under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), allowed a witness to testify as an expert despite his being clearly disqualified from doing so. The Trial Court acknowledged this fact but, instead of excluding the testimony as requested by Appellants Bi-Qem SA de CV and Bi-Qem, Inc.,[1] attempted to cure the problem by a limiting instruction to the jury. If a court could abdicate its gatekeeping duties by deferring the issue to a jury there would be no need for a Daubert analysis.

David Marcus was presented as an independent expert accountant on behalf of Appellee Trade Links, LLC ("Trade Links"). Mr. Marcus not only had a long-term relationship with Trade Links and its principal Mr. Essagof, but concealed and lied about this relationship when asked about it at his deposition. Mr. Marcus was specifically asked at his deposition about his prior dealings with Trade Links and its principal, and it was only at trial that he admitted that (contrary to his deposition testimony) he had performed professional services for Trade Links and its principal for years and had been paid more than $50,000.00 for these services.

---

[1]  Appellants will be collectively referred to herein as "Bi-Qem."

1

In addition, Mr. Marcus testified at trial for the first time that he had not only created Quickbook records for Trade Links, but in addition relied upon these records in providing his expert testimony. Mr. Macus also admitted at trial for the first time that he helped protect Mr. Essagof from significant IRS consequences arising from his underreporting of income, resulting in a 30% penalty assessment.[2]

As soon as the facts came out at trial Bi-Qem asked the Trial Court to conduct a Daubert analysis. Despite the facts that the Trial Court found that Mr. Marcus was not truthful and had relied upon his own work product in providing his damages computations, the Trial Court nevertheless ignored its Daubert obligations and allowed his "expert" testimony to go to the jury with a cautionary instruction relying upon Bi-Qem's "vigorous cross-examination" of Mr. Marcus. By ruling that "the issues raised by the Defendants [Bi-Qem] bear on the weight to be afforded the testimony, not the admissibility of the testimony," the Trial Court mistakenly applied discovery preclusion rules under Rule 37. Daubert directly addresses the admissibility of evidence: not its weight. The Trial Court's rationale for her ignoring Daubert was her fear that, if the testimony were stricken, Trade Links' case "is all but lost." This is simply not a relevant consideration under Daubert.

---

[2] Concealment of this fact precluded Bi-Qem from making a pre-trial Daubert motion and deprived Bi-Qem of the opportunity to impeach Mr. Essagof's credibility.

### b) Relevant Facts

Trade Links entered into a Sales Representative Agreement (the "SRA") with the predecessor to Appellant Bi-Qem SA DE CV in 1997, pursuant to which Trade Links would act as exclusive sales agent of chemical compounds in return for a specified commission (Appendix, hereinafter referred to as "A," pp. 368-389). Trade Links alleged that it entered into the same agreement with Appellant Bi-Qem, Inc. in 2008, but there is no writing memorializing this alleged agreement (A-429). Paragraph 11(d) of the SRA (A-377) contained a restrictive covenant precluding Trade Links from competing with Bi-Qem for one year if Bi-Qem terminated the agreement. The parties worked under the SRA for some twenty years. In 2019 Trade Links, desirous of competing with Bi-Qem and fearful of Bi-Qem's terminating the SRA and triggering the restrictive covenant, itself terminated the SRA without giving any notice of breach and thirty (30) days to cure as required by paragraph 11(b)(iv) of the SRA (A-417-419). This notice requirement is especially important in this case, as Bi-Qem paid all commissions owed to Trade Links within thirty (30) days of its termination letter (A-403-407). Had the requisite notice been given, Bi-Qem could have (as it did) paid commissions within thirty (30) days of the notice and avoided this lawsuit. Immediately upon termination of the SRA Trade Links' principal Elliot Essagof formed a new entity (Thermoset Solutions LLC) and began competing with Bi-

3

Qem. This competition exists to the present day. Even though it terminated the SRA and was competing with Bi-Qem Trade Links brought this action to recover lost future profits under the agreement based upon its argument that the SRA would have continued indefinitely had Bi-Qem not breached it.

During the course of the litigation Trade Links pursued in the words of the Trial Court a "kitchen sink" approach to the litigation (A-204, n. 6), asserting twelve different claims: (1) breach of contract; (2) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"); (3) violation of the Connecticut Franchise Act; (4) breach of the covenant of good faith and fair dealing; (5) interference with business expectancy; (6) violation of the Connecticut Commissions Statute; (7) violation of Chapter 93A of the Massachusetts Unfair Trade Practices Act; (8) vexatious litigation in violation of C.G.S. §52-568; (9) unjust enrichment; (10) breach of an implied contract; (11) fraudulent misrepresentation; and (12) fraud in the inducement. The Trial Court dismissed claims 3, 5, 8, 9, 11 and 12 before trial, ruling that some claims "were not, and could not be, plausibly alleged based upon the facts contained therein" (A-354). Claim number 6 (Connecticut Commissions Statute) for unpaid commissions was dismissed at the conclusion of Trade Links' case at trial for failure of proof, as the evidence established that all commissions due Trade Links had been paid within thirty (30) days of its termination of the SRA (A-442). Claims 1 (breach of contract), 2 (CUTPA), 4 (implied covenant of

4

good faith) and 7 (Massachusetts Unfair Trade Practices) went to the jury, which ruled in favor of Trade Links on claims 1 and 4 only (A-113-115).

The jury awarded Trade Links damages in the amount of $965,000.00 on these claims in the nature of lost profits, based solely upon the testimony and exhibits provided by its expert witness David Marcus, whose testimony should have been stricken. As found by the Trial Court, Mr. Marcus in his expert report stated that he had no interest in the matter and in his deposition he testified that he had only prepared tax returns for Mr. Essagof and was paid only a couple of thousands of dollars for this work (A-639). During his trial testimony Bi-Qem discovered for the first time that Mr. Marcus' deposition testimony was false, as he had (contrary to his deposition testimony) performed substantial work for Mr. Essagof and Trade Links. Not only did Mr. Marcus conduct a comprehensive forensic examination of Trade Links' QuickBooks entries but in fact he made changes in these entries and relied upon them in computing Trade Links' "average net profits" which provided the basis for his damages computations (A-414-416). Bi-Qem also discovered for the first time during Mr. Marcus' trial testimony that he had been retained to assist with a Federal tax audit of Trade Links, and had received approximately $54,000.00 for this work (A-541). Mr. Marcus testified at trial that Mr. Essagof had underreported his income and had to pay a 30% penalty

(A-597). Conveniently, Mr. Marcus testified that he could not recall the amount of the penalty paid by Mr. Essagof (A-607).

Immediately upon discovering these facts, Bi-Qem moved at trial to strike the testimony of Mr. Marcus under Daubert, supra, on the grounds that Mr. Marcus was not an independent expert and should be disqualified under the relevant CPA Code of Professional Conduct from acting as an expert witness for an existing client, and in addition was precluded from offering an expert opinion based upon client financial statements he himself had created and QuickBooks figures he himself had entered. Apparently feeling sorry for Trade Links, the Trial Court did not strike Mr. Marcus' testimony but instead instructed the jury that "his deposition testimony was as a factual matter not accurate" (A-665) and that when evaluation his testimony they should consider that he "was involved, as a factual matter, in the preparation of the records on which he relied when formulating his opinion regarding lost profits" (A-665). The Trial Court's rationale for this ruling was its opinion that "plaintiff's case is all but lost" (A-640) if Mr. Marcus' testimony was excluded and that "defendants were able to vigorously cross-examine Mr. Marcus" (A-640). In doing so, the Trial Court abdicated its responsibility as a gatekeeper under Daubert, and instead mistakenly weighed the admissibility of Mr. Marcus' testimony under ordinary exclusion rules.

**2. Judge Rendering the Decisions** – Judge Kari A. Dooley of the United States District Court of Connecticut.

**3. Disposition Below –**

Bi-Qem moved for judgment as a matter of law at trial (A-643-655) and renewed the motion post-trial (A-135-176 and A-183-195). This motion sought judgment based inter alia upon: Trade Links' failure to give the requisite notice to cure before terminating the SRA, and Mr. Marcus' disqualification as an expert witness. On February 27, 2023 the Court orally denied Bi-Qem's motion. A "minute entry" was entered in the docket that day (A-196), but no order was ever entered denying the motion (A-7, Docket Entry 305). Under Local Rule 77(a)(2) of the Connecticut District Court an order is deemed to be entered only when there is a "notation in the appropriate docket of an 'order.'"

Trade Links made a post-trial motion for attorneys' fees under the "indemnification" provision in the SRA, which provided in relevant part that a party breaching its obligations under the agreement shall "indemnify and hold the other party harmless" against expenses arising from such breach. Bi-Qem contends that this provision in paragraph 7(b) of the SRA (A-372-373) only applies to third-party (and not intra-party) claims. By order filed March 27, 2023 the Court granted Trade Links' motion (A-197-213). After extensive briefing the Court entered an order on January 18, 2024 awarding Trade Links $775,844.29 in

7

fees and costs (A-350-358). The Court did not award any pre-judgment interest as requested by Trade Links (A-344 and 347). The notice of appeal was filed on February 16, 2024 (A-359-361).

### 4. Citations of Decisions -

The following decisions were reported: (1) the March 27, 2023 order denying Bi-Qem's motion for fees under the Connecticut Commissions Statute and granting Trade Links' motion for fees under the "indemnification" provision in the SRA is reported at 2023 WL 2646832; and (2) the January 18, 2024 order quantifying Trade Links' fees but denying its request for pre-judgment interest is reported at 2024 WL 198024.

## POINT I

## EXPERT TESTIMONY OF MR. MARCUS SHOULD HAVE BEEN STRICKEN

Trade Links' sole witness on the question of future lost profits was its purported expert, David Marcus, who testified remotely and provided expert testimony based upon entries in Trade Links' financial documents which he himself made  and as found by the Trial Court whose "deposition testimony was, as a factual matter, not accurate" (A-665). The importance of Mr. Marcus' testimony is highlighted by the fact that the jury requested his damages computations (A-414-16) shortly before delivering its verdict (A-426-427). Not

8

only did the Court allow a perjurer's testimony to be considered by the jury, but the expert's perjury deprived Bi-Qem of the opportunity to impeach the credibility of Mr. Essagof and to preclude the expert's testimony through a Daubert motion prior to trial. As explained below Bi-Qem contends that such a pre-trial motion should have been granted as well as the motion made during the trial, with the result that Trade Links would have had no evidence to support a claim for future lost profits. Trade Links, which very well knew that Mr. Marcus committed perjury during his deposition, should not be rewarded for its duplicitous conduct, especially when Mr. Marcus' expert testimony would have been precluded had he been truthful when deposed.

At his deposition Mr. Marcus was asked what work he had performed for Trade Links and Mr. Essagof prior to his retention as an expert in this matter and he answered that he had only done his tax returns for three years and received $2,000.00 - $3,000.00 for this work (A-539).

At the end of Trade Links' case, during cross-examination of Mr. Marcus, Bi-Qem discovered that he had not told the truth at his deposition and that he had in fact performed substantial work for Trade Links and Mr. Essagof, including "a comprehensive forensic execution of [Mr. Essagof's] books and records pursuant to a federal tax audit" in 2016 and 2017 (A-465-466) and changing Trade Links' Quickbooks entries for 2013 and 2014 – entries he relied on in computing Trade

9

Links' "average net profits" (A-415), which was the basis for his "Damages-Discounted Cash Flow" chart (A-416). Mr. Marcus's representation in his expert report, that "we have no personal interest or bias with respect to the parties involved" (A-536) was false. At trial, for the first time Bi-Qem also discovered that Mr. Marcus was retained by the Mintz & Gold law firm[3] in 2016 to assist them with a federal tax audit and was paid approximately $54,000.00 for this work over 2016 and 2017 (A-540-541). At trial Mr. Marcus himself acknowledged that during his deposition he made a "misstatement because I didn't remember the facts and circumstances of the representation of Mr. Essagof and Trade Links" (A-540). Had Mr. Marcus been truthful at his deposition Bi-Qem would have made a pre-trial Daubert motion to preclude his expert testimony and it is submitted that the motion would have been successful for reasons which also supported the trial motion to strike.

First, Mr. Marcus based his future lost profits figures on numbers from Trade Links' Quickbooks account – numbers which he himself computed! Cf. TVT Records v. Island Def Jam Music Group, 250 F. Supp.2d 341, 345 (S.D.N.Y. 2003) (denying a motion to preclude an expert witness from testifying because

---

[3] Mintz & Gold not only retained Mr. Marcus on April 1, 2018 to provide expert services in this matter (A-420-422), but also was Trade Links' co-counsel when the first amended complaint was filed on March 25, 2019 (Document No. 6).

"TVT does not assert that any information [the expert] may have acquired in the course of those services formed the basis of the content of his report in this case"). Mr. Marcus admitted this at trial:

> **Q.** Did you change anything in the Quickbooks?
>
> **A.** In '13 and '14 we did. In any – in the years afterwards, we did not.
>
> **Q.** And you're relying on the changes you made to Quickbooks in '13 and '14 as part of the computations you made in this case?
>
> **A.** Yes (A-607).

Clearly, an expert cannot provide expert testimony based upon numbers which the expert computed, as he or she would merely be vouching for the accuracy of his or her own computations. As noted by the trial court, "in calculating lost profits, he is, in fact, relying on his own work product as an accountant for Trade Links" (A-503). This does not comport with "the exacting standards of reliability such [expert] evidence must meet." Weisgram v. Marley Co., 528 U.S. 440, 455 (2000).

Second, Mr. Marcus was not "independent," having represented Mr. Essagof in a complicated tax audit involving Mr. Essagof's underreporting of income. Perhaps Trade Links and its expert did not want Bi-Qem to know that in Mr. Marcus' opinion Trade Links' Quickbooks "were not done correctly" (A-542) and that Mr. Essagof had underreported his income and had paid a 30% penalty (A-607

11

- the amount of which Mr. Marcus conveniently could not recall), as such

misbehavior would have undermined Mr. Essagof's credibility. By falsely

testifying at his deposition, Mr. Marcus deprived Bi-Qem of this opportunity to

impeach Mr. Essagof's credibility. Credibility was an important issue at trial, as

Mr. Essagof attributed a number of uncorroborated statements to Bi-Qem's

principal Mr. Colombo.

Third, Mintz & Gold (Trade Links' sole attorneys at the time of the Marcus

retention and co-counsel with trial counsel Mr. McHugh through April of 2020)

knew when they retained Marcus that he had provided services to Mr. Essagof for

the tax audit and that he could therefore not be an independent expert for this trial.

Mr. Essagof also knew this, and his trial attorneys must have inquired of Mr.

Marcus' relationship with Mr. Essagof since Mr. Marcus was paid over

$100,000.00 for his expert services in this case (A-553).

Fourth, Mr. Marcus' retention as an expert violates the *per se*

disqualification rule in Section 1.295.140.04 of the American Institute of Certified

Public Accountants (AICPA) Code of Professional Conduct (A-424).[4] This

provision expressly states that a CPA who represents a client cannot under any

circumstances also provide expert services for that client since such services would

---

[4] Mr. Marcus testified that he is a member of AICPA (A-544). He had prepared Mr. Essagof's tax returns in 2018 and 2019 and was retained as an expert in April of 2018 (A-543).

be advocating a client's position and would compromise the CPA's integrity and objectivity:

> a. *Expert witness services.* For purposes of this interpretation, expert witness services are those litigation services in which a member is engaged to render an opinion before a trier of fact about the matter(s) in dispute based on the member's expertise, rather than his or her direct knowledge of the disputed facts or event:

> i. Expert witness services create the appearance that a member is advocating or promoting an *attest client's* position. Therefore, the advocacy *threat* would not be an *acceptable level* and could not be reduced to an *acceptable level* by the application of *safeguards.* Accordingly, <u>if a member is engaged conditionally or unconditionally to provide expert witness services or expert testimony for an *attest client, independence* would be *impaired*</u>... (emphasis added).

This Ethical Rule provides that there are absolutely no circumstances under which a CPA could reduce the "advocacy threat" to an acceptable level. Mr. Marcus' attempt to avoid the preclusive effect of this Rule, by testifying that he was providing services to Mintz & Gold and not to Mr. Essagof (A-534-535), is rejected by the definition of "attest client" in Section 1.295.140.02:

> *Attest client.* For purposes of this interpretation, the term *attest client* refers to an underlying party to the litigation for whom the member is providing services, not the law firm that engages the member on behalf of the law firm's client (A-424).

It is evident that Mr. Marcus' failure to disclose the extent of his relationship was, as noted by the Trial Court, "quite intentional" (A-628-629). Had he been truthful at the deposition Bi-Qem would have: (1) taken discovery to determine the amount of Mr. Essagof's underreporting of income and impeached Mr. Essagof at trial with this information – Mr. Essagof attributed many uncorroborated statements to Mr. Colombo and the jury should have been privy to the fact of Mr. Essagof's tax cheating in assessing his credibility; and (2) made a Daubert motion to exclude his expert testimony because he cannot offer an expert opinion based upon Trade Links' income and expenses where he himself entered these numbers into its Quickbooks accounts, and also because Mr. Marcus violated accountants' ethical rules by providing expert services to an existing client. Mr. Marcus admitted that, at the time of his retention as an expert, he was providing accounting services to Mr. Essagof (A-547). The explanation that Trade Links' trial counsel Mr. McHugh gave at trial for failing to disclose Mr. Marcus's extensive involvement with Trade Links, that he was allegedly unaware of the prior relationship between Messrs. Essagof and Marcus (A-639-640), is unavailing as a matter of law, as held in Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (affirming the preclusion of trial testimony):

> With respect to the first factor cited in *Softel*,
> Diodati explained that he had only recently been
> substituted as counsel and that he learned of the existence

14

of these witnesses in one of the first conversations he had with Balsamico about the matter. As the district court noted, <u>this explanation did not justify the failure to disclose those witnesses by prior counsel in a case that had been pending for years</u> and in which there had been no disclosure of the existence of these witnesses or the substance of their testimony. Moreover, even after Patterson submitted his Rule 26(a) disclosure on September 24, 2004, Diodati waited another three weeks before disclosing his witnesses, during which time, even by his own explanation, he should have been aware of their existence. Ultimately, as the district court found, <u>the explanation was not adequate</u> (emphasis added).

The case at bar is even more compelling than in <u>Patterson</u>, because Mr. McHugh signed the original complaint and was co-counsel with Mintz & Gold for more than one year. He also signed Mr. Marcus' expert witness retention agreement (A-420-422). Bi-Qem submits that, from his extensive involvement with Messrs. Sagor, Essagof and Marcus, Mr. McHugh at a minimum should have known of the prior relationship. Even if he did not, <u>Patterson</u> stands for the proposition that the knowledge of Mr. Sagor (Trade Links' co-counsel at the time), that he should not have retained Mr. Marcus as an expert witness and that Mr. Marcus' statement in his March 12, 2020 expert report that he had "no personal interest or bias with respect to the parties involved" (A-537) was false, is attributed to Trade Links. As found by the Trial Court "Mr. Essagof was certainly aware of the relationship" and therefore "bears responsibility for this nondisclosure" (A-640).

Mr. Marcus' false deposition testimony deprived Bi-Qem of their right to move in advance of trial to preclude his expert testimony. Had Mr. Marcus truthfully divulged the nature of his prior relationship with Trade Links Bi-Qem submits that the trial court would have precluded his expert testimony and certainly should have stricken his testimony once the true facts were established. Had his testimony been excluded, Trade Links would have had no evidence to support its claim for damages. Trade Links should not be allowed to benefit, and Bi-Qem should not be penalized, as a result of Mr. Marcus' perjurious deposition testimony. After considering "whether disqualification would be fair to the affected party [defendants] and would promote the integrity of the legal process," Hewlett-Packard Co. v. EMC Corp., 330 F.Supp.2d 1087, 1093 (N.D. Cal. 2004), the trial court should have stricken Mr. Marcus' expert testimony and vacated the judgment for future lost profits for breach of contract and breach of implied covenant of good faith and fair dealing.

The Trial Court's curative jury instruction (advising the jury that Mr. Marcus' deposition testimony was "not accurate" and that it could be viewed "with great caution" (A-665)) and conclusion that "Defendants were able to vigorously cross-examine Mr. Marcus" (A-640) simply do not satisfy the Court's Daubert gatekeeping obligations. A trial court has the obligation under Daubert to first find that the expert's testimony is "reliable" before allowing the jury to consider it

16

under any instruction.

As stated in <u>Laber</u> v. <u>Long View R.V., Inc.</u>, 454 F. Supp.3d 158, 164 (D. Conn. 2020):

> Indeed, "the Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (citations omitted).

<u>See also</u>, <u>Fraser</u> v. <u>Wyeth, Inc.</u>, 992 F.Supp.2d 68, 97 (D. Conn. 2014):

> the Court had the authority to raise Daubert concerns *sua sponte*. "*Daubert* stressed the trial judge's obligation to act as a gatekeeper to ensure that expert testimony is reliable. The insistence on reliability helps to ensure the integrity of the judicial process" (citations omitted).

and <u>Perkins</u> v. <u>Origin Medsystems, Inc.</u>, 299 F. Supp.2d 45, 52 (D. Conn. 2004):

> The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence, that the testimony is competent, relevant, and reliable. If the expert is deemed competent… the trial court must then determine, pursuant to its "gatekeeping" function, whether the proffered expert testimony is "relevant" and "reliable." See Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702 (noting that trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony") (citations omitted).

A review of relevant facts establishes that Mr. Marcus' expert testimony was not reliable and therefore should have been excluded.

First, as noted by the trial court, Mr. Marcus was "relying on his own work product as an accountant for Trade Links" (A-503) and "had a role in the creation of the books and records...on which he relied when both preparing tax returns as well as his expert opinion" (A-639).

Second, Mr. Marcus was not "independent" under the relevant rules of the American Institute of Certified Public Accountants (A-424),[5] and therefore not a "reliable" expert. As Mr. Marcus was providing litigation consulting services to Trade Links and its principal in an IRS tax audit when he was engaged as an expert in this case, his independence was impaired to such an extent that he was expressly prohibited from testifying as an expert:

> if the member providing litigation consulting services subsequently agrees to serve as an expert witness, threats to the member's compliance with the "Independence Rule" would not be at an acceptable level and could not be reduced to an acceptable level by the application of safeguards. Accordingly, independence would be impaired (A-425).

Third, the Trial Court found that: Mr. Marcus' deposition failure to disclose his full involvement with Trade Links was "quite intentional" (A-628-629); Mr. Essagof was "certainly aware" of Mr. Marcus' nondisclosure (A-640); and Mr.

---

[5] An expert accountant's "work on this case is governed by the consulting standards of the American Institute of Certified Public Accountants." U.S. v. Forbes, 2006 WL 2792883 (D. Conn.) at *1.

18

Marcus was not telling the truth (A-665). A perjurious expert should never be allowed to offer an opinion to the jury.

Fourth, as the trial court charged the jury, Mr. Marcus' deposition testimony was "not accurate" (A-665). The court explained its rationale for this conclusion:

> Mr. Marcus failed to disclose a business relationship with the Plaintiff that dates back to the Federal tax audit of Mr. Essagof's 2013 and 2014 tax returns, specifically as it relates to the books and records of Trade Links and the recording of income in those years.
>
> He failed to disclose that the business relationship, extended over several years, resulted in payments of over $50,000 for services rendered, and only in 2017 -- or 2018, I'm not sure precisely when -- did he refer Plaintiff to a corporate accountant.
>
> At his deposition, Mr. Marcus disclosed generally how he came to meet Mr. Essagof, and that he had prepared tax returns for Mr. Essagof for several years and had been paid approximately two to three thousand dollars for that work.
>
> It also came to light during his testimony that he had a role in the creation of the books and records, at least for 2014, on which he relied when both preparing tax returns as well as his expert opinion.
>
> And although I accept Plaintiff's counsel's representation that they were unaware of these prior engagements or Mr. Marcus's role in creating some of the records on which he relied in formulating his opinion, Mr. Essagof was certainly aware of the relationship he had with Mr. Marcus, which dated back to at least 2016. So Plaintiff, too, bears responsibility for this

nondisclosure (A-639-640).[6]

Although finding that Mr. Marcus was not truthful, the Trial Court did not strike

his expert testimony, instead ruling that the jury could assess his credibility in light

of Bi-Qem's cross-examination:

> That said, the Defendants were able to vigorously
> cross-examine Mr. Marcus on these issues and related
> issues, which impact Mr. Marcus's credibility, which the
> jury will, no doubt, consider when deciding whether to
> accept Mr. Marcus's testimony, and that could include
> both fact testimony and expert testimony (A-640).

The Trial Court made a similar ruling on Trade Links' post-trial Rule 50(b)

motion:

> As to the argument that the Court failed to strike
> Mr. Marcus's testimony, this argument is a much closer
> call, but ultimately, I determine, is unavailing. I remain
> of the view that the testimony was properly admitted,
> subject to the strongly-worded jury instruction regarding
> the jury's consideration of the testimony.
>
> Mr. Marcus was also the subject of extensive and
> unlimited cross-examination, and in my view, the issues
> raised by the Defendants bear on the weight to be
> afforded the testimony, not the admissibility of the
> testimony. The Defendants' conflate reliability under
> *Daubert* with credibility to a certain extent.
>
> Mr. Marcus was untruthful, but the fact that Mr.
> Marcus may have been found by the jury to be untruthful

---

[6] Mr. Marcus' false statement in his expert report, that he had "no personal interest or bias with respect to the parties involved" (A-536), can be added to this list.

in some matters does not necessarily implicate the reliability of his methodology or his opinions.

I will say it is a much closer call as to whether his involvement in the creation of the data on which he relied does implicate the reliability of his opinions under *Daubert*. But on the entirety of the trial record, I'm not going to revisit the admissibility of his testimony on this motion (A-308).

Bi-Qem contends that the trial court mistakenly applied the wrong standard in deciding this issue. Bi-Qem's argument focused on the reliability and therefore admissibility (and not the credibility) of Mr. Marcus' testimony. In considering the prejudice to Trade Links and the effect of Bi-Qem's cross-examination of Mr. Marcus the Trial Court applied rules regarding preclusion under Rule 37. See, e.g., Design Strategy, Inc. v. Davis, 469 F.3d 284, 296-297 (2d Cir. 2006). Instead, the Trial Court should have, in fulfilling its Daubert gatekeeping duties, first determined the reliability of the expert's testimony and should not have abdicated its role by deferring this issue to the jury, as held in Sardis v. Overhead Door Corp., 10 F.4th 268, 282-283 (4th Cir. 2021):

> Although the court recognized "legitimate concerns" with Dr. Wogalter's proffered testimony, it nonetheless deemed those concerns solely a subject for cross-examination. [The district court] reflexively "[found] that [ODC]'s arguments go to the weight the jury should afford [Dr. Singh's] testimony, not its admissibility." By doing so, the court "abandoned its gatekeeping function," thereby abusing its discretion.

21

The court similarly erred in ruling on ODC's post-trial Rule 50(b) motion. As to Dr. Singh, the district court doubled down, again finding that ODC's challenges went to the weight of the testimony, not admissibility. It pointed out that ODC "vigorously cross-examined Dr. Singh" on his failure to test his theories, but "the jury apparently found Dr. Singh's opinions credible." But credibility is entirely distinct from reliability and relevancy, which are preconditions to the admissibility of expert testimony. While cross-examination may be a proper tool to determine which of two competing experts' theories more credibly explains an event, even a "'thorough and extensive examination' does not ensure the reliability" or relevance "of [an] expert's testimony."…. Thus, as to both experts, the district court improperly "delegate[d] [its] gatekeeping responsibility to the jury," and thereby abused its discretion (citations omitted) (emphasis added).

See also, In re Onglyza, 95 F.4ᵗʰ 339, 348 (6ᵗʰ Cir. 2024); Hardeman v. Monsanto

Co., 997 F.3d 941, 960 n. 11 (9ᵗʰ Cir. 2021); and Nease v. Ford Motor Co., 848

F.3d 219, 230-231 (4ᵗʰ Cir. 2017):

In ruling on Ford's motion *in limine* to exclude Sero's testimony as unreliable under *Daubert*, the district court simply dismissed "[e]very argument raised by [Ford]" as "go[ing] to the weight, not admissibility, of [Sero's] testimony." The court did not use *Daubert's* guideposts or any other factors to assess the reliability of Sero's testimony, and the court did not make any reliability findings. Indeed, the district court referred neither to Rule 702 nor to *Daubert*. We are forced to conclude that the court abandoned its gatekeeping function with respect to Ford's motion *in limine*.

In denying Ford's post-trial Rule 50(b) motion for

judgment as a matter of law (which renewed Ford's argument that Sero's opinion should have been excluded under *Daubert*), the district court again "[found] that Ford's arguments go to the weight the jury should afford Mr. Sero's testimony, not its admissibility." Although the district court this time cited *Daubert* and stated that, according to Sero, "the methodology he employed is consistent and trustworthy and what historically is used in failure to decelerate cases," the court repeatedly emphasized that Ford effectively raised its objections to Sero's opinion through cross-examination. For the district court to conclude that Ford's reliability arguments simply "go to the weight the jury should afford Mr. Sero's testimony" is to delegate the court's gatekeeping responsibility to the jury. "The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." The district court's "gatekeeping function" under *Daubert* ensures that expert evidence is sufficiently relevant and reliable when it is submitted to the jury. Rather than ensure the reliability of the evidence on the front end, the district court effectively let the jury make this determination after listening to Ford's cross examination of Sero.

In sum, the district court did not perform its gatekeeping duties with respect to Sero's testimony. The fact that an expert witness was "subject to a thorough and extensive examination" does not ensure the reliability of the expert's testimony; such testimony must still be assessed before it is presented to the jury. Thus, we are of the opinion that the district court abused its discretion here "by failing to act as a gatekeeper." ("[T]rial-court discretion in choosing the manner of testing expert reliability ... is not discretion to abandon the gatekeeping function ... [or] to perform the function inadequately.") (citations omitted) (emphasis added).

23

As held in the cases cited above, reliability of expert testimony must first be determined by the trial court before permitting the jury to consider it. The fact that Bi-Qem"vigorously cross-examined" Mr. Marcus simply does not satisfy the Daubert reliability standard. As stated in U.S. v. Valencia-Lopez, 971 F.3d 891, 899 (9th Cir. 2020): "dismissing an argument as 'going to the weight, not admissibility, of [the expert's] testimony is not a reliability determination" (emphasis in original) (citation omitted).

As Mr. Marcus was Trade Links' sole witness on the issue of damages the striking of his testimony mandates that judgment be entered in favor of Bi-Qem. This Court's authority to enter judgment for Bi-Qem is established by the holding in Weisgram, supra, where (as here) the sole evidence supporting plaintiff's claim was provided by an expert witness who was found unreliable on appeal. The issue before the Court was:

> whether Federal Rule of Civil Procedure 50 permits an appellate court to direct the entry of judgment as a matter of law when it determines that evidence was erroneously admitted at trial and that the remaining, properly admitted evidence is insufficient to constitute a submissible case. 528 U.S. at 446.

In answering this question in the affirmative the Supreme Court:

> h[e]ld that the authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's

24

verdict. *Id*. at 457.

Citing Weisgram, this Court similarly held in Amorgianos v. National Railroad

Passenger Corp., 303 F.3d 256, 267 (2nd Cir. 2002) (affirming the preclusion of

expert testimony):

> if the admissible evidence is insufficient to permit a
> rational juror to find in favor of the plaintiff, the court
> remains free to direct a verdict or grant summary
> judgment for defendant.

Mr. Marcus's testimony should have been stricken, and judgment should be

entered in Bi-Qem's favor due to Trade Links' failure to prove its damages.

## POINT II

### TRADE LINKS' FAILURE TO PROVIDE A THIRTY
### (30) DAY NOTICE TO CURE IS FATAL TO ITS CLAIMS

Trade Links precipitously terminated the SRA on March 14, 2019 (A-417-

419). Trade Links did not introduce into evidence any document giving Bi-Qem

notice of an alleged breach and thirty (30) days within which to cure it, as required

by the SRA. Bi-Qem asserted this failure to comply with a contractual condition

precedent as its Seventh Affirmative Defense (A-108) and requested a separate

question directed to this issue in its verdict form, which the Trial Court refused to

submit (A-658-660). Trade Links' failure to provide notice to cure constitutes a

material breach of the SRA and mandates dismissal of its claims for breach of

contract and the implied covenant of good faith and fair dealing.

Paragraph 11(b) of the SRA (Ex. 1) reads:

> (b) Either Party may terminate this Agreement:
>
> (i) If the Defaulting Party acts in bad faith or continually fails to act in a commercially reasonable and ethical manner in connection with its obligations under this Agreement;
>
> (ii) If the Defaulting Party fails to make a payment due under this Agreement within ten (10) days following the date on which it is due, provided, however, the Defaulting Party shall have had thirty (30) days from the date of the payment default to cure such default.
>
> (iii) If an Event of Bankruptcy occurs with respect to either party or Eliot.
>
> (iv) If the Defaulting Party does not cure its failure to perform any[7] of its obligations hereunder, after thirty (30) days notice and opportunity to cure (A-376, emphasis added.)

Paragraph 17 of the SRA provides that notices must be delivered personally

or by overnight courier, and copies of notices from Trade Links must be sent to Bi-

Qem's attorney Michael Mackay:

> 17. NOTICES. Any notice that may or must be given to a party under the provisions of this Agreement shall be in

---

[7] The word "any" is clearly an all-encompassing term. See, e.g., Ramirez v. Health Net of Northeast, Inc., 285 Conn. 1, 14 (2008).

> writing and shall be delivered personally or by
> commercial overnight courier, to the party at the address
> shown above or such other address as may be designated
> by a written notice to the other as provided by this Article
> 19. A notice shall be deemed given when so delivered.
> A copy of any notice to Supplier [Bi-Qem] shall be sent
> at the same time to Michael W. Mackay, Esq., Wormser,
> Kiely, Galef & Jacobs LLP, 711 Third Avenue, New
> York, New York 10017 (A-381-382).

Bi-Qem submits that the SRA language is unambiguous and requires Trade

Links to give Bi-Qem and its attorney notice of any alleged breach and thirty (30)

days within which to cure it before Trade Links can terminate the agreement.

Indeed, in paragraph 11 of its July 17, 2018 demand for arbitration (Ex. 6) (where

Trade Links alleged that Bi-Qem had improperly terminated the SRA) Trade Links

admitted that the SRA could not be terminated without the allegedly breaching

party having had an opportunity to cure the breach:

> ● The Sales Representative Agreement was not
> terminated and could not be terminated absent cause
> which never occurred and which is subject to a cure
> period (A-395, emphasis added).

An arbitration demand "is the equivalent of a complaint in a lawsuit," Shuffle Tech

Int'l LLC v. Scientific Games Corp., 2018 WL 3104301 (N.D. Ill.) at *4, and

"circuits have allowed introduction of prior inconsistent pleadings as substantive

evidence pursuant to Fed.R.Evid. 801(d)(2)," Dugan v. EMS Helicopters, Inc., 915

27

F.2d 1428, 1432 (10th Cir. 1990). Trade Links cannot now assert that it was not required to give a notice to cure, when it alleged in its arbitration demand that the SRA required a notice to cure before it could be terminated. Cf., U.S. v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984) (holding that superseded pleadings are admissible):

> The law is quite clear that such pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party. A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories (citations omitted).

Trade Links terminated the SRA on March 14, 2019 (A-417-419[8]) without affording Bi-Qem the opportunity to cure the alleged breaches. The importance of a notice to cure is evident. If a party to a contract is given such notice it can avoid litigation by remedying any alleged default. The significance of a notice is highlighted here, as Bi-Qem within thirty (30) days of the termination letter paid all commissions which were owed to Trade Links up to the termination date (A-403-407). Had Trade Links sent a thirty (30) day notice alleging non-payment of commissions the entire matter would have been resolved without litigation.

---

[8] The termination letter (A-417-419) was sent to Bi-Qem's attorney Mr. Mackay as required by the notice provision in paragraph 17 of the SRA establishing that Trade Links was aware of this obligation.

Trade Links' failure to send a notice to cure constitutes a waiver of any right to claim a breach of the SRA, as held in Weiss v. Smulders, 313 Conn. 227, 264-265 (2014):

> The distribution agreement unambiguously states that if either party wishes to terminate the agreement upon the default of the other party, it must notify the breaching party and provide that party with thirty days to cure such default. At trial, Weiss admitted in his testimony that he had not notified Smulders of the alleged breaches by Garden of Light because he did not want to harm their relationship. In reliance upon this fact, the trial court held that the plaintiffs could not succeed on their claim for breach of the agreement because they had failed to abide by the terms of the distribution agreement. "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Office of Labor Relations* v. *New England Health Care Employees Union, District1199*, AFL–CIO, 288 Conn. 223, 231–32, 951 A.2d 1249 (2008). Therefore, the plaintiffs waived their right to assert a material breach of contract in defense of the defendants' counterclaim when they failed to notify the defendants of the alleged breaches and failed to provide them with an opportunity to cure such breaches.

Not only has Trade Links waived any right to claim a breach, but in fact its failure to give notice to cure in and of itself constitutes a material breach of the SRA, as held in Coppola Construction Co., Inc. v. Hoffman Enterprises Limited Partnership, 157 Conn. App. 139, 171, *cert. denied*, 318 Conn. 902 (2015):

29

a party's failure to comply with the notice provision in a termination clause invalidates any attempted termination and amounts to a material breach of the contract.

The Court so held after its analysis of relevant contract law:

> Although it is generally accepted that contracting parties may reserve the right to terminate a contract for convenience or cause upon a specified period of notice; *13 J. Perillo, Corbin on Contracts* (Rev. Ed.2003) § 68.9(3), p. 258; "[i]f a party who has a power of termination by notice fails to give the notice in the form and at the time required by the agreement, it is ineffective as a termination." Id., at pp. 258–59. "One who deviates from the terms and the circumstances specified in the agreement for giving notice ... may be regarded as having repudiated the contract, with all the effects of repudiation including giving the injured party a right to damages...." Id., at pp. 260–61; *see also D. Rosengren, 13 Connecticut Practice Series: Construction Law* (2005) § 1:19, p. 27 (failure to follow notice provision of termination clause invalidates termination and amounts to material breach of contract). *Id.* at 169-170.

The Connecticut Supreme Court recently reaffirmed this principle. See, Centerplan Construction Co., LLC v. City of Hartford, 343 Conn. 368, 418 (2022): "Improper termination is itself a material contract breach;" and Wells Fargo Bank, N.A. v. Lorson, 341 Conn. 430, 447 (2021): "when a person fails to comply with a condition precedent by initiating a cause of action, the right to recover never comes into existence."

By materially breaching the SRA Trade Links forfeited any right to future commissions, as it is hornbook law that a party's material breach of contract discharges the other party's further obligations under the contract. See, e.g., Shah v. Cover-It, Inc., 86 Conn. App. 71, 75 (2004):

> "It is a general rule of contract law that a total breach of the contract by one party relieves the injured party of any further duty to perform further obligations under the contract" (citations omitted).

The damages awarded to Trade Links for breach of the SRA were, as explained by the Court in its charge to the jury, based upon Bi-Qem's future performance under the SRA:

> future profits measured by his [Trade Links'] anticipated commissions less his overhead and operating expenses, which he claims he would have earned into the future in the absence of the Defendant's breach (A-670.)

Trade Links materially breached the SRA by terminating it without affording Bi-Qem an opportunity to cure, thereby discharging Bi-Qem from any obligation to pay future commissions. The jury award of "future profits" cannot stand.

## POINT III

### TRADE LINKS WAS NOT ENTITLED TO ATTORNEYS' FEES UNDER THE INDEMNIFICATION PROVISION OF THE SRA

31

Trade Links' motion for attorneys' fees should have been denied because the "Indemnification" provision in paragraph 7(b) of the SRA is not a clause permitting an award of fees to the prevailing party. Rather, it is (as held by this Court in a case on all fours emanating from the Connecticut District Court) an indemnification provision applicable to third party claims.

The indemnification provision at issue states:

> (b) *Indemnification Against Breach of Agreement.* Any party breaching its obligations under this Agreement (a "Defaulting Party") shall indemnify and hold the other party harmless against all claims, losses, damages, costs, and expenses (including reasonable attorneys' fees) of any nature or kind arising directly or indirectly from such breach (A-372-373, emphasis added).

In Rand-Whitney Containerboard Ltd. Partnership v. Town of Montville, 290 Fed. Appx. 430 (2d Cir. 2008), this Court was faced with the issue of whether a very similar indemnification provision permitted an award of fees to the prevailing party under Connecticut law in an action between the contracting parties. The indemnification provision at issue in that case stated in relevant part:

> [E]ach party shall indemnify...the other party...against all damages, losses or expenses suffered or paid as a result of any and all claims, demands, suits penalties, causes of action, proceedings, judgments, administrative and judicial orders and liabilities (including reasonable counsel fees incurred in any litigation or otherwise) assessed, incurred or sustained by or against such other

32

party…with respect to or arising out of…any breach by
the indemnifying party of its warranties, representations,
covenants or agreements…

District Court opinion at 2005 WL 8167296 (D. Conn.) at *1, n. 1.

This Court specifically held that the indemnification provision as a matter of

law did not apply to actions between the contracting parties:

> <u>The third issue on appeal is whether the</u>
> <u>indemnification provision in the contract applies only to</u>
> <u>claims brought by third parties or also applies to claims</u>
> <u>brought between the parties to the agreement, such that</u>
> <u>Montville would have to pay Rand–Whitney's attorneys'</u>
> <u>fees.</u> We review *de novo* the District Court's
> interpretation of the contract and its ultimate decision
> that the indemnification clause was ambiguous and a
> question for the jury. *See Aon Fin. Prods., Inc.,* 476 F.3d
> at 95–96. <u>Reading the contract as a whole, we find that</u>
> <u>the indemnification provision was not meant to apply to</u>
> <u>intra-party suits. Furthermore, under Connecticut law, the</u>
> <u>words "indemnification" and "hold ... harmless"—which</u>
> <u>are used in this contract—are typically interpreted to</u>
> <u>apply to third-party claims.</u> *See Amoco Oil Co. v. Liberty*
> *Auto and Elec. Co.,* 262 Conn. 142, 144, 148, 810 A.2d
> 259 (2002) ("The logic and rationale underlying our
> indemnity case law are based on the premise that an
> action for indemnification is one in which one party
> seeks reimbursement from another party for losses
> incurred in connection with the first party's liability to a
> third party."). We therefore reverse the District Court's
> decision to submit this issue to the jury and <u>find as a</u>
> <u>matter of law that Montville is not required to indemnify</u>
> <u>Rand–Whitney for attorneys' fees under the terms of the</u>
> <u>contract.</u> Rand-Whitney, *supra,* 290 Fed. Appx. at 433
> (emphasis added).

Connecticut state law on indemnity provisions is clear and well established. "Connecticut courts have explained that '[t]he logic and rationale underlying our indemnity case law are based on the premise that an action for indemnification is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party.'" <u>Danbury Buildings, Inc.</u> v. <u>Union Carbide Corp.,</u> 963 F. Supp. 2d 96, 103 (D. Conn. 2013) (citation omitted).

Paragraph 7(b) of the SRA, providing that a Defaulting Party "shall indemnify and hold the other party harmless against all claims," is unambiguous as a matter of law and does not permit Trade Links to recover its attorneys' fees incurred in this action. Accordingly, the Trial Court's order awarding Trade Links legal fees should be reversed.

## CONCLUSION

For the reasons specified above it is respectfully requested that this Court: a) reverse the June 13, 2022 judgment against Bi-Qem in the amount of $965,000.00; and b) reverse the March 27, 2023 order granting Trade Links' motion for attorneys' fees and costs and the January 18, 2024 order awarding $775,844.29 in

fees and costs.

Respectfully submitted,

APPELLANTS BI-QEM SA DE CV
AND BI-QEM, INC.

By:_____ /s/ James P. Cinque
James P. Cinque, Esq.
Cinque & Cinque, P.C.
355 Lexington Avenue, 8th Floor
New York, New York 10017
Telephone: (212) 759-5515
E-mail: CINQUE845@aol.com
Federal Bar No.: phv10065

**Federal Rule of Appellate Procedure Form 6 – Certificate of Compliance with Type-Volume Limit**

Certificate of Compliance with Volume Limit,
Typeface Requirements, and Type-Style Requirement

1. This document complies with the word limit of Fed.R.App.P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f): this document contains 8,424 words; and

2. This document complies with the typeface requirement of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 pt. font size Times New Roman type-style.

/s/ James P. Cinque

Attorney for Defendants-Appellants
Bi-Qem SA DE CV and Bi-Qem, Inc.

Dated: June 20, 2024

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Judgment in favor of Trade Links entered June 13, 2022 . . . . . . . . . . . . . . SPA-1

Minute Entry entered February 27, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-2

Order denying Defendants' Motion for Attorneys' Fees and Granting
    Plaintiff's Motion for Costs and Fees entered March 27, 2023 . . . . . . SPA-3

Order awarding Attorneys' Fees entered January 18, 2024 . . . . . . . . . . SPA-20

# SPA-1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TRADE LINKS, LLC.,

        Plaintiff,                        Case No. 3:19-cv-00308(KAD)

v.

BI-QEM SA de CV & BI-QEM, Inc.,
        Defendants.

## JUDGMENT

This matter came before the court for consideration by a jury trial before the Honorable Kari A. Dooley, United States District Judge. On June 3, 2022, the jury reached a verdict. (ECF. Doc. #259.) The jury found that plaintiff Trade Links, LLC. is entitled to an award of damages for lost profits against defendants Bi-Qem SA de CV and Bi-Qem, Inc. in the amount of $965,000.00.

Therefore, it is hereby ORDERED, ADJUDGED, and DECREED that judgment enter in accordance with the verdict for plaintiff Trade Links, LLC. against defendants Bi-Qem SA de CV and Bi-Qem, Inc. in the amount of $965,000.00 and the case is closed.

Dated at Bridgeport, Connecticut, this 13th day of June 2022.


DINAH MILTON KINNEY, Clerk

By: /s/ Kristen Gould
      Kristen Gould
      Deputy Clerk


EOD: 6/13/2022

# SPA-2

Case 3:19-cv-00308-KAD   Document 305   Filed 02/27/23   Page 1 of 1

Civil- (Dec-2008)

HONORABLE: Kari A. Dooley

DEPUTY CLERK Kristen Gould                    RPTR/ECRO/TAPE Tracy Gow

TOTAL TIME: 3 ___ hours 36 ___ minutes

DATE: 2/27/2023 ___    START TIME: 10:01am ___    END TIME: 1:37pm ___

LUNCH RECESS   FROM: _____ TO: _____

RECESS (if more than ½ hr)   FROM: _____ TO: _____

CIVIL NO. 3:19-cv-00308-KAD ___

Trade Links, LLC ___                           Keith A. Minoff, Patrick J. McHugh ___

                                               Plaintiff's Counsel

vs

BI-QEM SA de CV et al ___                      James P Cinque ___

                                               Defendant's Counsel

## COURTROOM MINUTES- CIVIL

[✓] Motion hearing              [ ] Show Cause Hearing
[ ] Evidentiary Hearing         [ ] Judgment Debtor Exam
[ ] Miscellaneous Hearing

| | | |
|---|---|---|
| [✓] ....#263 Motion for Attorney Fees | [ ] granted [ ] denied [✓] advisement |
| [✓] ....#265 Motion Motion to Amend/Correct Judgment | [ ] granted [ ] denied [✓] advisement |
| [✓] ....#266 Motion for Cost and Fees | [ ] granted [ ] denied [✓] advisement |
| [✓] ....#274 Motion for Judgment as a Matter of Law | [ ] granted [✓] denied [ ] advisement |
| [✓] ....#275 Motion for Order under Federal Rule 59(e) | [ ] granted [✓] denied [ ] advisement |
| [✓] ....#299 Motion for Leave to File | [ ] granted [ ] denied [✓] advisement |
| [ ] ....#___ Motion ___ | [ ] granted [ ] denied [ ] advisement |
| [ ] .... Oral Motion ___ | [ ] granted [ ] denied [ ] advisement |
| [ ] .... Oral Motion ___ | [ ] granted [ ] denied [ ] advisement |
| [ ] .... Oral Motion ___ | [ ] granted [ ] denied [ ] advisement |
| [ ] .... Oral Motion ___ | [ ] granted [ ] denied [ ] advisement |

[ ] ....   [ ] Briefs(s) due _____ [ ] Proposed Findings due_____ Response due_____

[ ] ............ _____ [ ] filed [ ] docketed
[ ] ............ _____ [ ] filed [ ] docketed
[ ] ............ _____ [ ] filed [ ] docketed
[ ] ............ _____ [ ] filed [ ] docketed
[ ] ............ _____ [ ] filed [ ] docketed
[ ] ............ _____ [ ] filed [ ] docketed
[ ] ............ _____ Hearing continued until _____ at _____

tes: |

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRADE LINKS, LLC | ) | CASE NO. 3:19-CV-00308 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BI-QEM SA de CV, ET AL. | ) | MARCH 27, 2023 |
| *Defendants*. | ) | |

### <u>MEMORANDUM OF DECISION</u>
### RE: MOTIONS FOR ATTORNEYS' FEES (ECF NOS. 263 & 266)

Kari A. Dooley, United States District Judge:

This case arises out of the breakdown of a two-decades-long contractual business relationship between the Plaintiff, Trade Links, LLC, and the Defendants, Bi-Qem SA de CV and Bi-Qem, Inc (together, "Defendants"). After a jury trial, the jury returned a verdict in Plaintiff's favor on two of its claims: breach of contract and breach of the implied covenant of good faith and fair dealing, and judgment accordingly entered in favor of Plaintiff and against Defendants. Pending before the Court are the parties' motions for attorneys' fees and court costs. For the reasons set forth below, Plaintiff's motion for attorneys' fees, ECF No. 266, is GRANTED, and Defendants' motion for attorneys' fees, ECF No. 263, is DENIED.

### FACTS AND PROCEDURAL HISTORY

For purposes of the instant motions, the Court assumes the parties' familiarity with the underlying facts and repeats only those necessary for disposing of the instant motions.

Plaintiff worked as the exclusive sales representative for Defendants, and the relationship of the parties was governed by the Sales Representative Agreement ("SRA"), dated November 9,

1999.[1] The parties' relationship under the SRA continued for almost two decades. However, the relationship between the parties began to deteriorate, and on May 31, 2018, Defendants sent a letter to Plaintiff advising that the SRA would terminate on December 31, 2018. Plaintiff eventually responded by filing a demand for arbitration with the American Arbitration Association ("AAA") on July 18, 2018. Both Defendants attempted to secure a stay of the arbitration, with Bi-Qem SA de CV filing a petition to stay in New York state court and Bi-Qem, Inc. filing a similar petition in Massachusetts state court. Defendants were unsuccessful in securing a stay in either forum. While the arbitration proceedings were pending before the AAA, Defendants sent a letter withdrawing the notice of termination. Thereafter, the parties reached a resolution whereby the arbitration and stay actions were dismissed prior to the arbitration panel rendering a decision.

In the months that followed, the parties' relationship further deteriorated, and in March of 2019, Plaintiff commenced the instant action against Defendants and formally terminated the SRA. Over the course of the litigation leading up to trial, Plaintiff asserted twelve separate causes of action arising out of the SRA and its termination against the Defendants: (1) breach of contract, (2) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*, (3) violation of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133e, *et seq.*, (4) breach of the covenant of good faith and fair dealing, (5) interference with business expectancy, (6) violation of the Connecticut sales representatives commissions statute ("Commissions Statute"), Conn. Gen. Stat. § 42-481, *et seq.*, (7) violation of the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws. ch. 93A, § 1, *et seq.*, ("Chapter 93A"), (8) vexatious litigation in

---

[1] Although Defendant Bi-Chem, Inc. argued that it was not bound by the SRA and did not adopt the SRA, and that, in any event, enforcement of the SRA against it is barred by the Statute of Frauds, the jury rejected each of these arguments in rendering a verdict in favor of Plaintiff on the Breach of Contract claim.

## SPA-5

violation of Conn. Gen. Stat. § 52-568, (9) unjust enrichment, (10) breach of implied contract, (11) fraudulent misrepresentation, and (12) fraud in the inducement.

Over the course of the litigation, Plaintiff's claims were winnowed down—some dismissed by the Court and others withdrawn voluntarily by Plaintiff. By the time the case was submitted to the jury, only four claims remained: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) CUTPA, and (4) Chapter 93A. The jury returned a verdict in favor of Plaintiff on the first two claims, and in favor of Defendants on the latter two. Judgment accordingly entered in favor of Plaintiff on June 13, 2022.

Now pending before the court are Plaintiff's and Defendants' cross motions for attorneys' fees and court costs.

## DISCUSSION

### I.   Defendants' Motion for Attorneys' Fees and Court Costs

As discussed above, Plaintiff initially brought a claim pursuant to the Connecticut Commissions Statute alleging unpaid or untimely payment of its sales commissions. At the summary judgment stage, Plaintiff asserted alternative dates on which a jury might decide the relationship between the parties ended—an event which triggers obligations under the Commissions Statute. Plaintiff's purported damages under the Statute depended, in large measure, on the date chosen. The Court determined that it could not, on summary judgment, decide the issue insofar as it presented a question of fact. At trial, the Court decided, as a matter of law, that the date the relationship ended was the date that Plaintiff sent its letter terminating the SRA to Defendants. Insofar as Defendants had made all commission payments required under the statute following that date, Plaintiff advised the Court that the Commissions Statute claim was "out of the case." *See* May 20, 2022 Trial Tr. at 380:15–381:6, ECF No. 283.

Defendants now seek attorneys' fees and court costs pursuant to the Commissions Statute asserting that they are the "prevailing parties" on Plaintiff's Commissions Statute claim. *See* Defs.' Mem. in Supp. at 2–3, ECF No. 263-2; Defs.' Reply at 2, ECF No. 292. In response, Plaintiff argues that it ultimately prevailed on other, related claims at trial, and that therefore Defendants cannot be the "prevailing parties" for purposes of the Commissions Statute claim. Pl.'s Mem. in Opp'n at 9–11, ECF No. 278. The Court agrees with Plaintiff.

"In diversity cases, attorneys' fees are considered substantive and are controlled by state law." *Retained Realty, Inc. v. Est. of Spitzer*, No. 3:06-CV-0493J, 2007 WL 2221431, at *1 (D. Conn. July 26, 2007) (quoting *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985)).[2] "Connecticut follows the common law 'American' rule in assessing the award of attorney's fees. Under the 'American' rule, 'attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception.'" *Cumulus Broadcasting v. Okesson*, No. 3:10cv314 (JCH), 2012 WL 3822019, at *1 (D. Conn. Sept. 4, 2012) (quoting *Ames v. Comm'r of Motor Vehicles*, 267 Conn. 524, 532 (2004)). Where a party claims a statutory exception to the American Rule, courts "require a clear expression of the legislature's intent to create" such an exception. *Comm'r of Env't Prot. v. Mellon*, 286 Conn. 687, 695 (2008).

The Court must therefore examine whether the Commissions Statute authorizes an award of attorneys' fees under the circumstances presented here. *See Mellon*, 286 Conn. at 695 (requiring a clear expression of the legislature's intent to award attorneys' fees to a particular entity where

---

[2] Because the Second Circuit has held that "in general, a litigant who is a prevailing party for purposes of attorney's fees is also the prevailing party for purposes of costs," *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 101–02 (2d Cir. 2006), and because the Court finds that Defendants are not the prevailing parties for purposes of attorneys' fees under the Commissions Statute, Defendants are not entitled to costs either.

"the legislature clearly has authorized the court to award attorney's fees but . . . is ambiguous as to whether a particular entity is entitled to such an award").

The Commissions Statute provides that "[t]he prevailing party in any action brought pursuant to subsection (b) of this section shall be entitled to reasonable attorney's fees and court costs." Conn. Gen. Stat. § 42-482(d). Defendants claim that, because Plaintiff's Commissions Statute claim was "dismissed" during trial,[3] they are the "prevailing parties" on that claim and are therefore entitled to attorneys' fees and court costs under the Statute. Defs.' Reply at 2. However, Defendants' argument proceeds on the assumption that prevailing party status under the Commissions Statute is determined on a claim-by-claim basis, such that a party need only "prevail" on the Commissions Statute claim alone in order to be entitled to fees and costs. The Court is not persuaded.

"When construing a statute, [the Court's] fundamental objective is to ascertain and give effect to the apparent intent of the legislature. In other words, [the Court] seek[s] to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of the case, including the question of whether the language actually does apply." *Athena Holdings, LLC v. Marcus*, 160 Conn. App. 470, 475 (2015) (quoting *Cruz v. Montanez*, 294 Conn. 357, 367 (2009)) (cleaned up). In determining a statute's meaning, a court should look first to the words of the statute itself and to its relationship to other statutes. *Id.* If the language is ambiguous, the Court may turn to extratextual evidence such as "the legislative history and circumstances surrounding [the statute's] enactment," "the legislative policy it was designed to implement," and "its

---

[3] Plaintiff states that the Commissions Statute claim was "withdrawn" from the action in response to the Court's ruling regarding the date on which the parties' business relationship ended, rather than dismissed. *See* Pl.'s Mem. in Opp'n at 9. As the Court never assessed the merits of the Commissions Statute claim and merely accepted Plaintiff's assessment that the Court's ruling effectively negated its claim for damages under the Commissions Statute, and because Defendants never requested nor were granted a dismissal of the claim, the Court agrees with Plaintiff's characterization that the claim was withdrawn, rather than dismissed. This is not a basis on which the Court denies Defendants' motion, however.

relationship to existing legislation and common law principles governing the same general subject matter." *Russell v. Russell*, 91 Conn. App. 619, 629 (2005) (quoting *Lombardo's Ravioli Kitchen, Inc. v. Ryan*, 268 Conn. 222, 230–31 (2004)).

The plain language of the Commissions Statute requires that a party be the "prevailing party" in an "action" in order to recover fees and court costs. Although the term "action" is not defined in the statute, Black's Law Dictionary defines "action" as "[a] civil or criminal judicial proceeding."[4] *See State v. Fernando A.*, 294 Conn. 1, 17 (2009) ("If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary."). "Every word and phrase of a statute is presumed to have meaning," *Tomick v. United Parcel Serv., Inc.*, 324 Conn. 470, 483 (2016) (cleaned up), and the Commissions Statute's inclusion of the word "action" suggests that, in order to obtain fees and costs under the Statute, a party must prevail in the litigation as a whole, rather than only on the Commissions Statute claim. If the legislature intended the Commissions Statute to operate on a claim-by-claim or defense-by-defense basis, it could have substituted "action" for "claim" or simply omitted any reference to an "action," but it did not do so, and the Court must give effect to the statute's plain language. *See id.* ("[A] statute must be construed, if possible, such that no clause, sentence or word is superfluous, void or insignificant." (cleaned up)).

---

[4] Black's Law Dictionary further observes that "[a]n action has been defined to be an ordinary proceeding in a court of justice, by which one party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense. . . . More accurately, it is defined to be any judicial proceeding, which, if conducted to a determination, will result in a judgment or decree. The action is said to terminate at judgment." ACTION, Black's Law Dictionary (11th ed. 2019) (quoting 1 Morris M. Estee, *Estee's Pleadings, Practice, and Forms* § 3, at 1 (Carter P. Pomeroy ed., 3d ed. 1885). "The terms 'action' and 'suit' are nearly if not quite synonymous." *Id.* (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3 (2d ed. 1899)); *see also Brownback v. King*, 141 S. Ct. 740, 751 (2021) (Sotomayor, J., concurring) ("An 'action' refers to the whole of the lawsuit. Individual demands for relief within a lawsuit, by contrast, are 'claims.'" (internal citations omitted)).

This conclusion is consistent with and bolstered by Connecticut caselaw, under which "prevailing party" is routinely defined by reference to a party's success in the litigation as a whole, with the most commonly accepted definition being "[a] party *in whose favor a judgment is rendered*, regardless of the amount of damages awarded." *Russell*, 91 Conn. App at 630–31 (emphasis added) (quoting *Frillici v. Westport*, 264 Conn. 266, 285 (2003); *Wallerstein v. Stew Leonard's Dairy*, 258 Conn. 299, 303 (2001); *Right v. Breen*, 88 Conn. App. 583, 591 (2005)). When confronted with cases involving partially prevailing plaintiffs, Connecticut courts have often stated that "if [a] party 'obtains judgment on *even a fraction of the claims advanced*, or is awarded only nominal damages, the party may nevertheless be regarded as the 'prevailing party.'" *Simms v. Chaisson*, 277 Conn. 319, 325 (2006) (emphasis added) (quoting *Russell*, 91 Conn. App. at 631). Indeed, the Supreme Court of Connecticut, in a case decided only four years before the Commissions Statute was enacted, stated, "it is difficult to see why one who has secured a judgment of the court in his favor should not be viewed as a party who has *prevailed in the action in question*, irrespective of the route by which he received that judgment." *Wallerstein*, 258 Conn. at 303 (emphasis added); *see also Fernando A.*, 294 Conn. at 19 ("[T]he legislature is presumed to be cognizant of judicial decisions relevant to the subject matter of a statute and to know the state of existing relevant law when it enacts a statute." (quotations omitted and cleaned up)).

Thus, although the Court has been unable to locate any cases directly addressing the issue presented here, the most logical reading of the Commissions Statute, and the one that is most consistent with Connecticut law generally, is that, in order to be entitled to fees and costs, a party must be the prevailing party in the action as a whole, rather than merely prevailing only on the Commissions Statute claim. Defendants cite no authority, and the Court has been unable to locate

any authority supporting a reading to the contrary.[5] Here, the jury returned a verdict in favor of Plaintiff on two of Plaintiff's claims and judgment accordingly entered in favor of Plaintiff. *See Wallerstein*, 258 Conn. at 303–04. Under Connecticut law, Defendants are therefore not the "prevailing party" in this "action" and are not entitled to an award of attorneys' fees and costs under the Commissions statute.

Accordingly, Defendants' motion for attorneys' fees and court costs, ECF No. 263, is DENIED.[6]

## II.    Plaintiff's Motion for Attorneys' Fees and Court Costs

The Court next turns to Plaintiff's motion for attorneys' fees and court costs, ECF No. 266. Plaintiff argues that it is entitled to attorneys' fees and court costs pursuant to section 7(b) of the SRA and seeks costs and fees for all of the stages of its litigation with Defendants, including the arbitration and state court actions that took place prior to instituting the present dispute.

---

[5] Both parties cite exclusively to federal court cases in their memoranda regarding the instant motion. However, as noted above, because this is a diversity case, Connecticut law, rather than federal law, controls the determination of who is a "prevailing party." *See Grand Union Co.*, 761 F.2d at 147.

Moreover, Defendants' reliance on *Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983)) is misplaced. Defendants argue that "in determining the identity of a prevailing party in a case asserting several claims, the determinative factor is whether the claims 'are based upon different facts and legal theories.'" Defs.' Reply at 3 (quoting *Hensley*, 461 U.S. at 434–35). However, the Court in *Hensley* was not concerned with "determining the identity of a prevailing party," as Defendants represent, but with "determin[ing] what fee is 'reasonable'" in the situation in which "a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." 461 U.S. at 433–34. These are distinct issues. And because every case cited by Defendants, with the exception of *Soley v. Wasserman*, No. 08-CV-9262 KMW FM, 2014 WL 4798901 (S.D.N.Y. Sept. 25, 2014), presupposes the identity of the prevailing party (the plaintiff), they shed little light on the issue before this Court, *see, e.g.*, *Cabrera v. Astrue*, No. 06 CIV. 9918 (JCF), 2008 WL 4410094, at *1 (S.D.N.Y. Sept. 29, 2008) ("It is undisputed that the plaintiff met all three of these requirements [including the requirement that the plaintiff be the prevailing party] and is entitled to receive attorneys' fees."); *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998) ("The court's normal starting point for calculating reasonable attorneys' fees to be awarded to a prevailing civil rights plaintiff is the calculation of a so-called 'lodestar' figure . . . ."). Nor is *Soley* helpful to Defendants. First, *Soley* involved an assessment of costs only, not a statutory entitlement to attorneys' fees. *See* 2014 WL 4798901, at *3. Further, the competing mechanisms identified in *Soley* for determining a "prevailing party" for purposes of assessing costs derive from a compendium of cases which apply different laws to the issue than those applied by Connecticut courts.

[6] Although the Court concludes that Plaintiff's failure to obtain a judgment on the Commissions Statute claim, specifically, does not entitled Defendants to attorneys' fees and court costs under the Statute, Plaintiff's kitchen-sink approach to the litigation and failure to sustain the majority of the claims originally advanced may be relevant in determining what attorneys' fee award under the SRA for Plaintiff is "reasonable." *See Conservation Comm'n of Town of Fairfield v. Red 11, LLC*, 135 Conn. App. 765, 786 (2012) (noting that one factor to be considered in adjusting an attorneys' fee award is "the amount involved and the results obtained" in the litigation).

**i.      Whether Section 7(b) of the SRA Applies to First-Party Actions**

As discussed above, under Connecticut law, an exception to the "American" rule regarding an award of attorneys' fees is the existence of a statutory or contractual provision allowing for such an award. *Total Recycling Servs. of Ct. v. Conn. Oil Recycling Servs, LLC*, 308 Conn. 312, 326–27 (2013). The Court therefore first examines whether the SRA authorizes such an award.

Plaintiff argues that it is entitled to attorneys' fees and court costs pursuant to section 7(b) of the SRA. *See* Pl.'s Mem. in Supp. at 3, ECF No. 267. Defendants argue that section 7(b), which is entitled "Indemnification Against Breach of Agreement," is an indemnification provision intended to apply only to third-party disputes, and therefore that it unambiguously does not apply to the instant action which arises between the contracting parties ("first-party actions"). *See* Defs.' Mem. in Opp'n at 2–3, ECF No. 280. Alternatively, Defendants posit that the provision is at least ambiguous as to whether it applies to first-party actions, and therefore that the interpretation of the provision should have been submitted to the jury. *Id.* at 3–4. Because Plaintiff never sought to submit the question to the jury, Defendants argue that Plaintiff has waived any claim to attorneys' fees under the provision. *Id.* Plaintiff counters that the section unambiguously does provide for attorneys' fees in first-party actions, and moreover that the Court already held as much in an oral ruling made during trial. *See* Pl.'s Reply at 4, 6–8, ECF No. 295.

As an initial matter, the Court considers Plaintiff's argument that the Court has already ruled that the SRA unambiguously provides for attorneys' fees in first-party actions. By way of background: at the summary judgment stage of the proceedings, Defendants argued that section 11(c) of the SRA restricted Plaintiff's post-termination remedies such that Plaintiff could only seek commissions on orders placed prior to the SRA's termination.[7] *See* Defs.' Mot. Summ. J. at 10–

---

[7] Section 11(c) of the SRA provides:

18, ECF No. 165-24. In opposition, Plaintiff argued, *inter alia*, that such a reading of section 11(c) is incongruous with section 7(b), which Plaintiff alleged "specifically addresses the situation where one party has breached the Agreement and requires that party to make the other party whole for any resulting harm." Pl.'s Summ. J. Opp'n at 9, ECF No. 181. Plaintiff further argued that section 7(b) "expressly provides that the party breaching its obligations shall indemnify the other party for all damages and expenses *including reasonable attorneys' fees*," and noted, specifically, that the provision was "not limited to reimbursement for a claim brought by a third party." *Id.* at 10–11 (emphasis in original). Defendants did not respond to Plaintiff's arguments regarding section 7(b) in their summary judgment briefing, and the Court did not reach these arguments in denying Defendants' motion. *See generally* Order Denying Mot. Summ. J., ECF No. 195.

At trial, the Court was confronted with the issue of whether section 11(c) was ambiguous and should therefore be submitted to the jury to determine whether it limited Plaintiff's available remedies and damages, or whether it was unambiguous as a matter of law. *See* May 18, 2022 Trial Tr. at 5:17–9:18, ECF No. 281. The Court indicated that, in determining whether the provision was ambiguous, it would refer back to the summary judgment briefing. *Id.* at 6:10–14; 8:19–24. The Court also briefly heard argument on the issue, during which Plaintiff once again argued that section 7(b) allows for the nonbreaching party to seek "various types of relief, including monetary damages, as well as attorneys' fees and costs." *Id.* at 8:6–11. Once again, Defendants did not respond to Plaintiff's arguments regarding section 7(b).

---

*Rights and Obligations of Parties Following Termination.* Upon termination of this Agreement, neither Representative nor Supplier shall have any rights and obligations with respect to each other except as otherwise specifically provided herein. Termination of this Agreement shall not affect the rights and obligations of Representative with respect to orders for Products procured by Representative and accepted by Supplier prior to the effective date of termination.

## SPA-13

Two days later, the Court ruled that section 11(c) unambiguously did not limit Plaintiff's remedies, stating:

> The Defendants have asserted that Section 11(c) serves as a limitation on Plaintiff's claims and damages in this litigation. I disagree. The section unambiguously does no such thing. It does not preclude the Plaintiff from seeking damages for a claimed breach of the contract, and indeed, his right to do [so] is clearly set forth in Section 7(b).
>
> So the jury will not be asked to interpret Section 11(c) and will not be charged with respect to this argument.

May 20, 2022 Trial Tr. at 370:6–13.

Plaintiff alleges that the Court's statement above constituted a ruling that Section 7(b) unambiguously applies to first-party actions. *See* Pl.'s Mem. in Supp. at 4 n.2; Pl.'s Reply at 4. Although the issue was not squarely before the Court, Plaintiff did clearly advance, on numerous occasions, the argument that section 7(b) applied to first-party actions and allowed for the recovery of attorneys' fees in this case. And Defendants never countered those arguments. It is further clear that the Court found this argument compelling in ruling that section 11(c) did not restrict Plaintiff's remedies. Given this history, Plaintiff's argument that the issue has already been decided is persuasive.

Notwithstanding the above, because the applicability of section 7(b) to first-party actions was not, at least arguably, squarely before the Court prior to the instant motion, the Court examines the issue at this juncture with the benefit of the briefing from both sides. Having now done so, the Court concludes that section 7(b) unambiguously provides for an award of attorneys' fees under the circumstances presented here.

Defendants rely on the Second Circuit's opinion in *Rand-Whitney Containerboard Ltd. P'ship v. Town of Montville*, 290 F. App'x 430 (2d Cir. 2008), for the proposition that section 7(b) is an indemnification provision that is applicable only to third-party claims. *See* Defs.' Mem. in

Opp'n at 1–2. In *Rand-Whitney*, the court held in a summary order that the contractual indemnification provision at issue there unambiguously did not apply to first-party actions. 290 F. App'x at 433. Relying on the Connecticut Supreme Court's opinion in *Amoco Oil Co. v. Liberty Auto & Elec. Co.*, 262 Conn. 142, 144 (2002), the *Rand-Whitney* court stated that "under Connecticut law, the words 'indemnification and hold . . . harmless'—which are used in this contract—are typically interpreted to apply to third-party claims." *Rand-Whitney*, 290 F. App'x at 433 (emphasis added). However, the *Rand-Whitney* decision "merely states that under Connecticut law, phrases such as 'indemnification' and 'hold harmless' are '*typically* interpreted to apply to third-party claims.'" *Helming & Co., P.C. v. RTR Techs., Inc.*, 76 F. Supp. 3d 363, 370 (D. Mass. 2015) (quoting *Rand-Whitney*, 290 F. App'x at 433).

In *Amoco Oil*, the Connecticut Supreme Court stated that "[t]he logic and rationale underlying our indemnity case law are based on the premise that *an action for indemnification* is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party." 262 Conn. at 148 (emphasis added). However, *Amoco Oil* is factually inapposite to the circumstances at issue here,[8] and, as subsequently

---

[8] As aptly summarized by the District of Massachusetts in *Helming*:

> In *Amoco*, the plaintiff hired the defendant to construct underground gasoline tanks. More than six years later, the plaintiff discovered that one of the tanks was leaking and brought suit. The six-year statute of limitations had run on any claim for breach of contract, so plaintiff anchored its claim on the indemnification provisions of the parties' contract. The Connecticut Supreme Court concluded that plaintiff's claim for losses was "not a claim for indemnification at all, but, rather, a claim for damages for its own losses arising out of [the defendant's] allegedly negligent and improper installation of the tanks." In other words, plaintiff's lawsuit was, in fact, a claim for breach of contract dressed up as an indemnification action to avoid the statute of limitations problem.

76 F. Supp. 3d at 369–70. Thus, at issue in *Amoco Oil* was the proper characterization of the plaintiff's lawsuit as either an indemnification action or breach of contract action. *See Heyman Assocs. No. 5, L.P. v. FelCor TRS Guarantor, L.P.*, 153 Conn. App. 387, 412 (2014). Conversely, Plaintiff here is not attempting to initiate an *action for indemnification* against Defendants, but rather is claiming that section 7(b) of the SRA, although labeled as an indemnity provision, is broad enough that it also encapsulates claims for attorneys' fees in the instant, properly initiated breach of contract action.

discussed by the Appellate Court of Connecticut, did not address "whether contractual language . . . that utilizes the phrase 'indemnify and hold . . . harmless,' is limited to *an action for indemnification*, or whether that language may support a claim between the contracting parties." *Heyman*, 153 Conn. App. at 414 (emphasis in original). Confronting that question head-on, the Appellate Court found that such language is not "talismanic" nor does it "automatically dictate[] that the provision allows only an action for indemnification limited to the coverage of only third party claims." *Id.* at 415. Rather, the *Heyman* court held that the determination of whether a contractual provision containing terms such as "indemnify" and "hold harmless" applied to first-party actions depended on well-established principles of contract interpretation. *Id.*

Thus, "[i]n reviewing a claim that attorney's fees are authorized by contract, [a Court must] apply the well established principle that [a] contract must be construed to effectuate the intent of the parties, which is determined from [its] language . . . interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Id.* (quoting *Total Recycling*, 308 Conn. at 327). "[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]." *Id.* (quoting *Conn. Nat'l Bank v. Rehab Associates*, 300 Conn. 314, 319 (2011)). Applying these principles to the provision at issue in that case, the *Heyman* court found that the provision unambiguously applied to first-party actions.[9] *Id.* at 415–17. The court reasoned that the

---

[9] The provision at issue in *Heyman* provided, in relevant part:

> [Holiday Inn] agrees to and does hereby indemnify and hold [BRS] harmless hereunder from all claims, demands, losses, damage, expenses and costs including, but not limited to, reasonable attorney's fees and expenses arising out of or in connection with [Holiday Inn's] failure, from and after delivery of this instrument, to observe, perform and discharge on time each and every one of the covenants, obligations and liabilities assumed by [Holiday Inn] in this instrument relating to, or accruing with respect to the period from and after, not before the date hereof.

language of the provision was broad and "not expressly limited to third party claims," and that interpreting the provision in a way that restricted it to third-party claims "would render portions of the indemnification provision superfluous." *Id.* at 415–16.

Likewise, section 7(b) of the SRA unambiguously applies to claims for attorneys' fees in the instant action. Beginning with the plain language of the provision, section 7(b) provides:

> <u>Indemnification Against Breach of Agreement.</u> Any party breaching its obligations under this Agreement (a "Defaulting Party") shall indemnify and hold the other party harmless against all claims, losses, damages, costs, and expenses (including reasonable attorneys' fees) of any nature or kind arising directly or indirectly from such breach.

Just as in *Heyman*, section 7(b) is broadly worded, encompassing "all claims . . . of *any nature or kind*." *Cf. Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178–79 (2d Cir. 2005) (finding, under New York law, that "the broad language of the second provision . . . indicates 'unmistakably' that the parties intended for the second provision to apply to 'actions of any kind or nature,' including actions between the parties"). Section 7(b) is also not expressly limited to third-party claims—in fact, it speaks specifically of claims arising from any party's "breach" of the SRA, a term generally employed in the context of first-party contract disputes. Indeed, it is difficult to think of a party more likely to assert a claim arising from the breach of the contract than a party to the contract itself. And, given that no other provision in the SRA addresses a first-party's rights or remedies in the event of the other party's breach, it is manifest that the parties intended for section 7(b) to be the operative provision in such circumstances.

Further supporting this conclusion is the fact that section 7(a), which immediately precedes section 7(b), refers specifically to third-party actions. Section 7(a), entitled "Indemnification

---

153 Conn. App. at 410.

Against Liability for Trademarks and Products," reads as a third-party indemnification provision. For example, it provides: "[Defendants] shall defend any such claims against [Plaintiff]" and "[Defendants] . . . shall pay any judgment that may be rendered against [Plaintiff] for any such claims." Taken together, the only reading of section 7 as a whole is that section 7(a) was intended to apply to third-party disputes while section 7(b) was not intended to be so restricted.

Thus, "[g]iven the broad language of [section 7(b)] and the absence of any indication that it was limited to third party claims," *Heyman*, 153 Conn. App. at 417, the Court concludes that section 7(b) unambiguously applies to first-party actions and provides for an award of attorneys' fees and costs to Plaintiff in this case for Defendants' breach of the SRA.[10]

### ii.    Amount of Reasonable Fees and Costs

Because the Court finds that section 7(b) unambiguously provides for Plaintiff's recovery of attorneys' fees in the event of Defendants' breach, and because the jury found that Defendants breached the SRA, no issues of fact remain regarding Plaintiff's claim to attorneys' fees, and the Court can properly determine the amount of fees to be awarded. *See New Shows, S.A. de C.V. v. Don King Prods., Inc.*, No. 95 CIV. 8851 (RPP), 1999 WL 553780, at *11 (S.D.N.Y. July 29, 1999), *aff'd*, 210 F.3d 355 (2d Cir. 2000) (citing *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993)). Plaintiff seeks all of its fees and costs incurred not only in this action, but also in the prior litigation against Defendants to include the AAA arbitration and state-court proceedings that took place before this case was filed. *See* Pl.'s Mem. in Supp. at 7–14. Defendants did not address the amount of fees and expenses requested by Plaintiff, but indicated that they

---

[10] In an accompanying declaration of Defendants' counsel, Attorney Cinque argues that, even if section 7(b) applied to first-party actions, Plaintiff is not entitled to attorneys' fees under the provision because Plaintiff is not the "prevailing party." *See* Cinque Decl. at ¶ 8, ECF No. 279. This argument incorrectly presupposes that section 7(b) requires that Plaintiff must be a "prevailing party." However, section 7(b) includes no such language. And in any event, under Connecticut law, as discussed above, Plaintiff is the prevailing party in this litigation.

"reserve the right to do so in the event that the Court rules that [Plaintiff] is entitled to fees." Defs.' Mem. in Opp'n at 4. Having so ruled, the Court will allow supplemental briefing to address the amount of fees and expenses that Plaintiff shall receive. The Court does, however, render some preliminary rulings as to the scope of the fees that may be properly awarded.

Specifically, the Court concludes that Plaintiff may not seek the costs and fees arising from the AAA arbitration and state-court proceedings which occurred prior to the bringing of the instant action. On this issue, Plaintiff contends that the Court "preserved Plaintiff's right to recover attorneys' fees and costs in connection with the arbitration proceeding commenced by [Plaintiff]" in ruling on Defendants' motion for summary judgment. Pls.' Mem. in Supp. at 7. However, Plaintiff takes the Court's decision on the motion for summary judgment entirely out of context. The Court held that Plaintiff may have a right to seek the arbitration fees and related litigation costs as part of its *damages* arising out of Defendants' breach of contract in the instant litigation, but that Plaintiff would "bear the burden of establishing the causal nexus between any such damages and the cause of action(s) asserted." Order Denying Mot. Summ. J. at 15. And it goes without saying that the question of whether Plaintiff has met this burden is for the jury to decide. *See Barry v. Posi-Seal Int'l, Inc.*, 40 Conn. App. 577, 581 (1996) ("Assessment of damages is peculiarly within the province of the jury . . . ." (quotation omitted)). When Plaintiff reiterated its intention to seek such damages at trial, Defendants objected on the ground that they had never received any discovery in support of this damages claim. In light of Plaintiff's failure in this regard, Plaintiff withdrew any claim for those damages and the jury was not asked to decide whether those fees and costs were incurred *as a result of* Defendants' breach of the SRA. Simply because the Court has construed section 7(b) to allow an award of attorneys' fees in connection with this

**SPA-19**

litigation does not render what should have been pursued as damages within the scope of the available award. The SRA does not eliminate the Plaintiff's burden of proving damages.

Accordingly, while Plaintiff may recover attorneys' fees and court costs arising out of the instant action for breach of contract against Defendants, Plaintiff may not recover fees incurred in connection with the AAA arbitration or state-court proceedings. If Defendants wish to contest the amount of the fees sought, they may file supplemental briefing on or before **April 17, 2023**. Plaintiff may respond to any supplemental submission by **May 1, 2023**.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for attorneys' fees and court costs, ECF No. 263, is DENIED. Plaintiff's motion for attorneys' fees and court costs, ECF No. 266, is accordingly GRANTED to the extent that the Court finds that Plaintiff is entitled to recover reasonable attorneys' fees and court costs pursuant to section 7(b) of the SRA.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March 2023.

_/s/ Kari A. Dooley_
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRADE LINKS, LLC, | ) | CASE NO. 3:19-CV-00308 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BI-QEM SA de CV, ET AL., | ) | JANUARY 18, 2024 |
| *Defendant(s)*. | ) | |

MEMORANDUM OF DECISION
RE: MOTION FOR ATTORNEYS' FEES (ECF NO. 266)

Kari A. Dooley, United States District Judge:

Pending before the Court is Plaintiff Trade Links, LLC's motion for attorneys' fees and costs in the amount of $1,750,054.79 incurred in connection with this litigation which resulted in a jury trial against the Defendants, Bi-Qem SA de CV and Bi-Qem, Inc. (together, "Defendants"). For the reasons that follow, Plaintiff is awarded $712,303.27 in attorneys' fees and $63,541.02 in costs.

**Facts and Procedural History**

For purposes of the instant motion, the Court assumes the parties' familiarity with the underlying facts and repeats only those necessary for disposing of the instant motions.

In March of 2019, Plaintiff commenced the instant action against Defendants. Over the course of the litigation leading up to trial, Plaintiff asserted or attempted to assert twelve separate causes of action arising out of the breakdown in the parties' business relationship: (1) breach of contract, (2) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*, (3) violation of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133e, *et seq.*, (4) breach of the covenant of good faith and fair dealing, (5) interference with business expectancy, (6) violation of the Connecticut sales representatives commissions statute

("Commissions Statute"), Conn. Gen. Stat. § 42-481, *et seq.*, (7) violation of the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws. ch. 93A, § 1, *et seq.*, ("Chapter 93A"), (8) vexatious litigation in violation of Conn. Gen. Stat. § 52-568, (9) unjust enrichment, (10) breach of implied contract, (11) fraudulent misrepresentation, and (12) fraud in the inducement.

Some of these claims were disallowed. Some were dismissed by the Court and others withdrawn voluntarily by Plaintiff. By the time the case was submitted to the jury, only four claims remained: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) CUTPA, and (4) Chapter 93A. The jury returned a verdict in favor of Plaintiff on the first two claims, and in favor of Defendants on the latter two. Judgment accordingly entered in favor of Plaintiff on June 13, 2022.

After the trial, both parties moved for attorneys' fees and costs. The Court denied Defendants' request and simultaneously ruled that Plaintiff was entitled to recover fees under the parties' governing contract, the Sales Representative Agreement ("SRA"). *See* ECF No. 309. Because Defendants' objection to Plaintiff's request for attorneys' fees did not address the amount to be awarded to be Plaintiff, Defendants sought and were permitted to file supplemental briefing rebutting Plaintiff's request as to the propriety of the amount sought. Plaintiff subsequently filed a lengthy submission in response to Defendants' supplemental objection, of which the Court considers only the memorandum of law and not the attached affidavits and exhibits. *See* ECF No. 334 at 6.

**Standard of Review**

"In diversity cases, attorney's fees are considered substantive and are controlled by state law." *U.S. v. One Parcel of Property Located at 414 Kings Highway*, No. 5:91–CV–158 (EBB), 1999 WL 301704, at *4 (D.Conn. May 11, 1999) (citations omitted). "Where a contract provides

for the payment of attorney's fees ... those fees are recoverable solely as a contract right. ... Therefore, the language of the [contract] governs the award of fees."[1] *Watson Real Est., LLC v. Woodland Ridge, LLC*, 208 Conn. App. 115, 125, 264 A.3d 96, 102–03, *cert. denied*, 340 Conn. 911, 264 A.3d 577 (2021). Recovery is therefore permissible so long as the request for fees "is not unreasonable upon its face and has not been shown to be unreasonable by countervailing evidence or by the exercise of the court's own expert judgment." *Id.*

Several factors govern a court's determination of an appropriate award of attorneys' fees. These factors, summarized in Rule 1.5(a) of the Connecticut Rules of Professional Conduct, include: "the time and labor required; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; the fee customarily charged in the locality for similar legal services; the amount involved and the results obtained; the time limitations imposed by the client; the experience, reputation and ability of the lawyer or lawyers performing the services, and whether the fee is fixed or contingent." *WiFiLand, LLP v. Hudson*, 153 Conn. App. 87, 103, 100 A.3d 450, 459 (2014). Additionally, courts "may rely on their general knowledge of what has occurred at the proceedings before them to supply evidence in support of an award of attorney's fees." *Total Recycling Servs. of Ct., Inc. v. Connecticut Oil Recycling Servs., LLC*, 308 Conn. 312, 327, 63 A.3d 896, 905 (2013) (internal citations and quotations omitted).

"[A] party may recover attorney's fees for unsuccessful claims, but those claims must be inextricably intertwined and involve a common basis in fact or legal theory with the successful claims." *Francini v. Riggione*, 193 Conn. App. 321, 336, 219 A.3d 452, 462 (2019). A further "key consideration in evaluating a claim for litigation expenses is the overall extent of the success achieved. Where a party succeeds on one claim, but fails on other claims brought in the same suit,

---

[1] The Court has already determined that the Plaintiff is entitled to an award of attorneys' fees under the language of the applicable contract – the Sales Representative Agreement ("SRA"). *See* ECF No. 309.

the size of his attorneys fee award should reflect his success, as determined by the trial court in securing redress for the injuries that prompted his successful claim and reasonable legal cost incurred in pursuing this success." *Rice v. Ryders Health Mgmt., Inc.*, No. KNL136016915S, 2016 WL 3769093, at *4 (Conn. Super. Ct. June 16, 2016) (internal citations and quotations omitted).

**Discussion**

Plaintiff buckets its fees request into the following categories: the parties' prior arbitration and state court proceedings (totaling $325,448.26) [2]; commencement of the underlying civil action and its initial discovery and motion practice (totaling $435,975.83); "heavy" discovery, international depositions by remote protocol, and summary judgment (totaling $510,488.67); initial motions in limine following the Court's ruling on summary judgment (totaling $59,398.80); and preparation of the joint trial memorandum, jury selection, and trial (totaling $418,743.23). *See* Pl.'s Mem. in Supp., ECF No. 267. In total, Plaintiff seeks a fee award of $1,750,054.79.

Defendants maintain that Plaintiff's submission is deficient because it lacks affidavits from some of Plaintiff's attorneys and because Plaintiff did not submit contemporaneous time records of its attorneys. Defs. Mem. in Opp'n at 1, ECF No. 313. Defendants additionally argue that Plaintiff seeks fees for "excessive and duplicative time," including time spent "conferencing and strategizing"; that its submission is riddled with vague descriptions and compensation for time spent on matters not within the purview of the underlying civil action; and that Plaintiff has block billed and seeks fees for work that established a right to indemnification. *Id.* at 3-6. Defendants further claim that Plaintiff is not entitled to recover fees for any claims other than breach of contract

---

[2] The Court has already ruled that the Plaintiff is not entitled to attorneys' fees incurred as a result of the prior arbitration or state court litigation involving the same parties. *See* ECF No. 309. While the Court agreed that such fees could be sought as damages at trial, the Defendants objected insofar as no discovery with respect to any such damages had been provided. The Plaintiff then made the decision not to seek the arbitration and state court litigation attorneys' fees from the jury.

under the language of the SRA. *Id.* at 7, 12. Finally, Defendants urge the Court to apply an overall "downward modification" of at least 75% of the requested fees, pointing to Plaintiff's "very limited success" in pressing most of its original claims. *Id.* at 13, 17.

Having considered the parties' arguments, the Court has determined that Plaintiff is not entitled to the full amount of fees sought and is instead entitled to $712,303.27.

First, the Court subtracts from the starting point of the analysis the $325,448.26 sought in connection with the prior arbitration and state court litigation, which results in a total possible award of $1,424,606.53. Next, in determining the amount of the award, the Court does not question counsel's hourly rates and finds them to be reasonable. However, considering the various factors outlined above, there are significant reasons to further reduce the award sought by Plaintiff.

This litigation has been marred by excessive and unreasonable litigation strategies by all parties, plaintiff included. *See, e.g.,* ECF No. 112, Order ("Although the parties in this litigation have evinced a reluctance to agree on anything, have chosen a wasteful and contentious litigation strategy, and their experienced counsel do not appear inclined to suggest a different path, nothing in this Order precludes the parties from agreeing to an alternative arrangement for taking Mr. Coppari's deposition.") Plaintiff commenced this action with the filing of an eight count Complaint, which contained claims that were not, and could not be, plausibly alleged based upon the facts contained therein. After much time and briefing, the Court dismissed with prejudice count three, purportedly brought under the Connecticut Franchise Act and count eight, a statutory vexatious litigation claim. Particularly unfounded, and arguably frivolous, was Plaintiff's effort to bring the allegations within the parameters of the Connecticut Franchise Act. Plaintiff also sought to amend the complaint to add four new causes of action. Again, after significant briefing, the Court denied the request to add two fraud-based claims because they were inadequately pled. The

Court permitted two additional contract-based claims – unjust enrichment and breach of implied contract – but only as against one defendant. *See* ECF No. 121.

In addition, through summary judgment briefing, Plaintiff was unable to articulate its factual theory behind the count alleging tortious interference with business expectancies. When the Defendants sought summary judgment on the ground that Plaintiff, as Defendants' agent, did not have any separate business or contractual relationships with Defendants' customers, Plaintiff argued that this was not the basis for his claim. Although Defendants' argument was based upon a fair reading of Plaintiff's complaint, the Court denied summary judgment as the parties were simply briefing past each other (a common occurrence). But the Court also warned the Plaintiff that it would be required to better articulate the basis for this claim at trial. Rather than do so, Plaintiff withdrew the claim at the time of trial. Whatever time and resources derive from the inclusion of this discarded claim must be accounted for in the fee award.

Eventually, of the many claims originally brought, only four went to trial, and the jury returned a Plaintiff's verdict as to only two of the four – breach of contract and breach of the covenant of good faith and fair dealing. The jury rejected the CUTPA and Chapter 93A claims. The jury's verdict confirmed what the years of litigation had long revealed – this was a straightforward breach of contract claim arising out of a bitter breakdown of a longstanding personal and professional relationship between the parties and their principals. It should have been litigated as such.[3] Instead, the litigation was thoroughly infected with the personal animus that

---

[3] The Defendants' conduct throughout the litigation was also troubling and the record is replete with circumstances under which the Court questioned the propriety, if not the ethics, of the Defendants' litigation strategy. *See, e.g.,* ECF No. 145 ("This litigation has been marred by questionable litigation strategies and this motion appears to be, unfortunately, more of the same. Indeed, this motion to dismiss raises the question of whether the Defendants' counsel has adequately considered his obligations under Rule 11(b).") And to the extent such conduct contributed to Plaintiff's attorneys' fees, those fees are awarded. The Court's concerns with the Defendants however are not detailed herein because this decision is about how much to award the Plaintiff. And so it is the Plaintiff's request that comes under the Court's scrutiny.

existed between the parties' principals. *See, e.g.*, ECF No. 313 at 7-9 (describing and including the competing narratives as to who the real "bully" was in this litigation, Plaintiff's principal Mr. Esagoff or Defendants' principal Mr. Colombo.)

The Court further observes that Plaintiff posited a damages award that, depending on the jury's determination as to how far into the future the SRA would have been kept in place, could have been in excess of $10 million. *See* ECF No. 256 and 291 at 90-92. The jury awarded less than $1 million dollars, rejecting Plaintiff's claim that the SRA could and would persist in perpetuity, at the Plaintiff's bidding.

Finally, it would be impossible to parse through the invoices and time records submitted to determine which entries relate specifically to the breach of contract claims on which Plaintiff prevailed. And the Court agrees with Plaintiff that to some extent, the factual support for the breach of contract claims overlapped with the other claims. The Court also resoundingly rejects Defendants' invitation to review defense counsel's hand-written notes on a marked up version of the invoices as a means of eliminating billed time. Under all of the circumstances of this case, the Court concludes that a straight percentage reduction in the amount sought is appropriate. *See, e.g., Carter v. Wolf*, No. 3:06-CV-1351 (HBF), 2013 WL 1946827, at *4 (D. Conn. May 9, 2013) (reducing amount of attorneys' fees sought by 35% due to plaintiff's limited success on claims and vagueness of entries in fee application); *Friedman v. SThree PLC.*, No. 3:14-CV-00378 (AWT), 2017 WL 4082678, at *12 (D. Conn. Sept. 15, 2017), *objections overruled*, No. 3:14-CV-378 (AWT), 2019 WL 13171423 (D. Conn. Oct. 9, 2019) (applying 40% reduction of fee award for "excessive, duplicative and vague billing"); *Houston v. Cotter*, 234 F. Supp. 3d 392, 410 (E.D.N.Y. 2017) (applying 50 percent reduction to hours requested in fee application). The Court's award is a reflection of, *inter alia,* the 1) limited success at trial in terms of claims proven; 2) the limited

success at trial in terms of the damages awarded; 3) the overbroad nature of the claims pursued; 4) the abandonment at trial of one claim which had been fully litigated through summary judgment, and 5) the unnecessary briefing of tenuous legal positions. Accordingly, the Court reduces the amount of the award sought, $1,424,606.53, by 50% and awards Plaintiff $712,303.27.

Costs

Plaintiff seeks costs in the amount of $127,422.46. This figure includes costs incurred in connection with the arbitration in the amount of $59,471.66, which, for the reasons identified with respect to the request for attorneys' fees incurred in connection with the arbitration, must be immediately deducted from any award. The maximum award of costs sought is therefore reduced to $67,950.80.

In this vein, Plaintiff asserts that its costs are not limited to those permitted under Fed. R. Civ. P. 54, because Paragraph 7(b) of the SRA allows for costs as within Plaintiff's permitted recovery for breach of contract. Defendants assert that Plaintiff's entitlement to costs is limited to those permitted under Rule 54. The Court agrees with Plaintiff. In *Crawford Fitting Co. v. J.T. Givvons, Inc.,* 482 U.S. 437 (1987), the Supreme Court held "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's" costs, district courts are limited with respect to an award of costs by statute. District courts in this Circuit often award costs over and above those authorized by Rule 54 on the basis of contractual provisions. *See Bernhard-Thomas Bldg. Systems, LLC v. Weitz Co., LLC,* 2011 WL 5222682, at *7 (D. Conn. October 31, 2011) (Rule 54 and 28 U.S.C. §1920 "provide the framework for determining the proper award of statutory costs, available to the prevailing party in all cases, but do not apply if a contractual provision authorizes costs and expenses, as part of an attorney's fee award"); *see also, Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp.,* No. 04-CV-3854 (LAK) (AJP), 2008

WL 4833025, at *8 (S.D.N.Y. Nov. 3, 2008); *Rangolan v. County of Nassau,* 370 F.3d 239, 250

(2d Cir.2004) ("[T]he district court has no discretion to award costs not authorized by statute or

contractual provision") (internal citations omitted).

Plaintiff offers the Affidavit of Mr. Essagoff. Attached as Exhibit D[4] to the Affidavit is a

spreadsheet of invoices for "Miscellaneous depositions, witness costs, etc." It totals $38,955.37

and attached to the spreadsheet are the actual invoices. These costs are awarded.

Plaintiff offers the billing statements from his various counsel, each of which sets forth the

"expenses" incurred and passed on to Plaintiff. The Court has reviewed this documentation for the

period January 1, 2019 through the date of the jury's verdict. These expenses total $24,585.65 and

they are awarded.[5]

**Conclusion**

For the foregoing reasons, Plaintiff is awarded attorneys' fees in the amount of $712,303.27

and costs in the amount of $63,541.02, for a total award of **$775,844.29**, which shall be paid to

Plaintiff's counsel within 60 days of this Order.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of January 2024.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[4] The Affidavit does not actually reference any Exhibit D. However, the attachment at Exhibit D appears to coincide with the description in the Affidavit of Exhibit C. The content of Exhibit C is not explained but in any event references invoices from 2018 which the Court does not award. Accordingly, the $2,000 reflected in the Exhibit C Invoice is not awarded.

[5] The Court does not award fees in connection with Plaintiff's Supplemental requests for fees premised upon post-trial litigation and briefing. Accordingly, Plaintiff's motions at ECF Nos. 299, 306 and 326 are DENIED. Neither Plaintiff nor Defendants prevailed in their post-trial substantive motions, with the exception of the attorneys' fees issue. As such, in the Court's view, whatever time was spent by Plaintiff trying to revive the Chapter 93A claim, though sought, cannot be awarded. Nor is the Court inclined to dissect the billing records to distinguish between Plaintiff's failed post-trial efforts and Defendants' failed post-trial efforts.